Donald A. TANNAHILL, Plaintiff,

v.

UNITED STATES, Defendant.

Douglas R. FAVELL, Jr.,
et al., Plaintiffs,

v.

UNITED STATES, Defendant,

and related cases.

Nos. 147–77T, 525–76T, et al.

United States Claims Court.

Jan. 24, 1992.

Charles L. Abrahams, La Mesa, Cal., Atty. of Record, for plaintiffs.[1]

---

**1.** Mr. Abrahams represents not only plaintiff Tannahill, but also has filed notices of appearances in all the other related hockey player tax refund cases (see footnote 3 below). Because Mr. Abrahams also filed an almost identical motion to disqualify defendant's counsel in all

Terry Coles, Tax Div., Dept. of Justice, Washington, D.C., Atty. of Record, for defendant.[2]

## OPINION

HORN, Judge.

### BACKGROUND

On June 12, 1991, the defendant, United States, filed a motion for sanctions in the above captioned case, Case No. 147–77, against the plaintiff's counsel, under Rule 11 of the Rules of the United States Claims Court (RUSCC).[3] In its motion, the defendant argues that sanctions against the plaintiff's counsel are appropriate, alleging that plaintiff's counsel signed pleadings in the *Tannahill* case, which he knew contained false statements, and that plaintiff's counsel filed the petition in the *Tannahill* case without the knowledge or consent of the named plaintiff, Mr. Tannahill. Specifically, the defendant asserts that plaintiff's counsel had not discussed this action in advance with Mr. Tannahill. Therefore, the defendant's counsel maintains that plaintiff's counsel knew that the statement in the petition that Mr. Tannahill demanded

the other related hockey player tax refund cases, and because included in his allegations are alleged impermissible contacts by defendant's counsel with plaintiffs in some of those other hockey player cases, this Opinion will address and dispose of the allegations of impermissible contacts in the *Tannahill* case and in all the other related hockey player tax refund cases (see footnote 4 below).

2. Ms. Coles was appointed as attorney of record in *Tannahill v. United States*, when defendant's counsel of record in all the related hockey player tax refund cases was relieved by this court from his representation of the United States, pending resolution of the motion for sanctions brought by plaintiff's counsel against defendant's counsel of record. A new Department of Justice attorney other than Ms. Coles also was appointed attorney of record in the remaining hockey player cases. As used throughout the instant Opinion, "defendant's counsel" refers to the individual against whom plaintiff's counsel filed the motion to disqualify. In this Opinion, references to other attorneys, such as Ms. Coles, who appear on behalf of the United States will be by name. Because the court has found, as is more fully described below, that the allegations brought by plaintiff's counsel were unfounded, the name of defendant's original counsel has been redacted from any quoted testimony, and will not be used in this Opinion.

3. *Donald A. Tannahill v. United States* is one of two-hundred and thirty-one (231) related tax refund cases filed on behalf of hockey players in the United States Court of Claims and the United States Claims Court. The cases originally filed in the United States Court of Claims were transferred to the United States Claims Court in 1982, after the enactment of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (1982).

The Honorable Philip R. Miller, of the United States Court of Claims, and then of the United States Claims Court, presided over these cases until his retirement. During this time, 194 additional related cases were filed. Upon Judge Miller's retirement, all the hockey player cases were transferred to this Judge. Since then, 37 additional similar tax refund cases have been brought, bringing the total number of related cases to 231. The cases were filed starting in 1976, until the most recently filed case was submitted to the court in 1990.

Pursuant to Orders of this Court dated February 22, 1991, 22 Cl.Ct. 571, and March 4, 1991, fifteen (15) of the related cases were dismissed for jurisdictional defects. On February 25, 1991, this court issued an Order requiring the plaintiffs in all the related hockey player cases to file one of two attached Notices by June 28, 1991; "Notice A" was to be filed if the plaintiff desired to continue prosecuting his case, and "Notice B" was to be filed if the plaintiff wanted the court to dismiss his/her claims. Subsequently, on October 2, 1991, this court issued an Order dismissing with prejudice eight (8) of the related cases in which the plaintiffs had filed Notices B. Also on October 2, 1991, this court issued an Order dismissing eighty-eight (88) cases, without prejudice, for failure to prosecute, in which the plaintiffs failed to send in either Notice A or Notice B by the June 28, 1991 deadline. However, the court allowed the filing of thirty-two (32) Notices A & B received as late as September 24, 1991, pursuant to Order dated October 1, 1991. An Order issued on October 23, 1991 reinstated two cases. In an Order issued January 15, 1992, this court dismissed two additional cases. Consequently, at the present time, one-hundred twenty (120) related hockey player tax refund cases are pending before this court. Presently, Motions to Dismiss or to Partially Dismiss are pending in eight (8) of the related hockey player cases filed in 1989.

The disposition of the hockey player tax refund cases has been delayed by the complexity of the issues, the large number of plaintiffs, the plethora of supporting documents filed in the cases, the need for successive judges to become familiar with the filings, and the many lengthy requests by both parties for extensions of time in order to file motions and to prepare for the trials, which had been scheduled by the court.

judgment against the United States was untrue. In support of its Motion for Sanctions, the defendant's counsel states that he had received a telephone call on June 6, 1991 from Mr. Donald Tannahill, the plaintiff in the above captioned case. Defendant's counsel claims that Mr. Tannahill stated that he knew nothing about being a plaintiff in this court and requested an explanation of this court's Order dated February 25, 1991 which he had just received in the mail.

4. In order to broaden his request for sanctions and disqualification to all the other related hockey player tax refund cases, plaintiff's counsel filed a virtually identical motion in *Douglas R. Favell, Jr., et al. v. United States,* also entitled "Motion & Memorandum of Law in Support of Motion for Sanctions Including Disqualification of the Department of Justice and * * * [defendant's counsel]." The text of the two motions is the same. However, attached to the motion in the *Favell, et al.* case, are several additional exhibits, marked Exhibit B, Exhibit C and a Declaration of Charles L. Abrahams, signed and dated July 18, 1991.

5. The court notes that the motion to disqualify filed by plaintiff's counsel, Mr. Abrahams, also asked to disqualify the entire Department of Justice from representing the defendant, the United States, in the related hockey player tax refund cases. The court does not decide this additional issue of plaintiff's counsel at this time, and will allow supplemental briefing of the issue by both parties as scheduled in a separate Order issued by the court. The court notes, however, relevant statutory and case law appears to dictate that such a remedy, if available at all, must be considered an extreme and highly unusual remedy, to which a court should resort in only the most outrageous and egregious circumstances.

The basic statute which grants the Attorney General the authority to litigate on behalf of the United States, 28 U.S.C. § 516, states:

Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.

28 U.S.C. § 516 (1988).

Additionally, 28 U.S.C. § 519 grants the Attorney General the authority to supervise litigation to which the United States is a party. It states:

Except as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party, and shall direct all United States attorneys, assistant United States attorneys, and special attorneys ap-

In response to defendant's motion, on August 12, 1991, the plaintiff's counsel, Mr. Charles Abrahams, filed a motion entitled "Motion & Memorandum of Law in Support of Motion for Sanctions, Including Disqualification of the Department of Justice and * * * [defendant's counsel]."[4] In this rambling motion, the plaintiff's counsel argues that the defendant's counsel of record and the United States Department of Justice[5] both should be sanctioned or disqualified from further participation in

pointed under section 543 of this title in the discharge of their respective duties.

28 U.S.C. § 519 (1988).

Furthermore, the statute also states:

(a) Except when the Attorney General in a particular case directs otherwise, the Attorney General and the Solicitor General shall conduct and argue suits and appeals in the Supreme Court and suits in the United States Claims Court or in the United States Court of Appeals for the Federal Circuit and in the Court of International Trade in which the United States is interested.

28 U.S.C. § 518 (1988).

Courts have consistently operated under the principle that the Attorney General is given power over and general supervision of all litigation to which the United States or an agency thereof is a party. *Dresser Indus., Inc. v. United States,* 596 F.2d 1231, 1237, *reh'g denied,* 601 F.2d 586 (5th Cir.1979), *cert. denied,* 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980); *Hogg v. United States,* 428 F.2d 274, 278 (6th Cir. 1970), *cert. denied,* 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 805 (1971); *Federal Trade Com. v. Guignon,* 390 F.2d 323, 324 (8th Cir.1968). In *Nutrition 21 v. United States,* 930 F.2d 862, 864 (Fed. Cir.1991), the United States Court of Appeals for the Federal Circuit specifically stated that 28 U.S.C. § 516, "reserves to the Attorney General the conduct of litigation to which the U.S. is a party."

As stated in 28 U.S.C. § 519, exceptions are recognized only to the general rule that the Department of Justice has the sole authority to conduct litigation in which the United States is a party in cases when the law specifically provides otherwise. For example, in *Interstate Commerce Commission v. Southern Railway Co.,* 543 F.2d 534 (5th Cir.1976), *reh'g denied,* 551 F.2d 95 (5th Cir.1977), the court noted that "Congress has expressly provided for one exception to the Attorney General's supervision power over government litigation—'except as otherwise authorized by law'—such that when an agency is given specific authorization to proceed without the assistance or supervision of the Attorney General it may do so." *Id.* at 537–38; *Federal Trade Com. v. Guignon,* 390 F.2d at 324.

In tax refund litigation, in federal courts, it seems clear to this court that the Department of Justice is the agency authorized to defend the United States Government. The court, however,

the hockey players tax refund cases, due to allegations that defendant's counsel had participated in *ex parte* discussions with the plaintiff, Tannahill, and other hockey player plaintiffs, out of the presence of the plaintiff's counsel of record, Mr. Abrahams.[6]

On July 8, 1991, because of the nature of the allegations made against defendant's counsel, this court ordered that defendant's counsel of record be relieved from appearing in the *Tannahill* and in all the other related hockey player tax refund cases as defendant's counsel of record until the court could hold a hearing and decide the merits of plaintiff's allegations contained in the motion for disqualification of defendant's counsel of record. Defendant's counsel, although relieved of all responsibilities in the case, and denied the right to appear as counsel of record pending resolution by the court of the allegations, was permitted to remain in the courtroom and to sit at counsel table during proceedings in the *Tannahill* and the other *Favell* related cases.[7]

The court held a fact-finding hearing on the plaintiff's motion to disqualify defendant's counsel on September 23 through 25, 1991, in San Diego, California, which was continued on October 15 through October 18, 1991, in Washington, D.C. The court heard the testimony of certain witnesses in San Diego in order to accommodate those witnesses for whom it was particularly difficult to appear outside of California.[8] Ms. Coles appeared as counsel for the defendant, the United States, and to represent the interests of the Department of Justice attorney against whom the charges had been made. The attorney for the plaintiff, Mr. Abrahams, did appear at the San Diego portion of the hearing and, in fact, testified in support of his motion. However, plain-

takes no position in this Opinion on how the United States should be represented in the extremely rare case, if indeed such a case could occur, in which the Department of Justice has engaged in a conspiracy which so violated the rules of ethical conduct for the conduct of litigation, that some court feels action must be taken and that disqualification of one or more particular Justice Department officials cannot cure the problem.

6. The plaintiff's counsel also contends that the plaintiffs' Sixth Amendment rights have been violated by the alleged *ex parte* discussions. The plaintiff alleges the following:

This intrusion by the Government into the confidentiality of the attorney-client relationship includes access to litigation strategy, list of possible witnesses and information concerning potential testimony. This type of information was obtained by the Department of Justice in violation of the Sixth Amendment.

The court, however, notes that the Sixth Amendment establishes the right to counsel for criminal defendants, and does not apply to civil litigation. The Sixth Amendment states:

In all *criminal prosecutions,* the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence.

U.S. Const. amend. VI (emphasis added).

Therefore, since the plaintiff's Sixth Amendment contentions do not apply to this civil tax case, the court will not address them any further.

7. The court decided to address Mr. Abrahams' motion against defendant's counsel first because of the serious nature of the allegations, and because of the impending trial schedule in certain of the hockey player tax refund cases at which the defendant wished to have the same defendant's counsel appear as the attorney for the United States in the event he was cleared of the allegations. In fact, the court had received urgent and repeated requests from senior representatives of the United States Department of Justice, to resolve the charges against their colleague early enough to have him hopefully resume as counsel of record, if the court found he could continue on the cases, given his familiarity with all the 231 related hockey player tax refund cases to which he had been assigned in 1989. Furthermore, in the government's motion for sanctions, the defendant had not requested that Mr. Abrahams be relieved as counsel. Therefore, the court felt that addressing defendant's earlier filed motion for sanctions after plaintiff's motion was appropriate in order to avoid impacting the trial schedule.

8. The statute which creates the United States Claims Court includes a provision stating that: "The times and places of the sessions of the Claims Court shall be prescribed with a view to securing reasonable opportunity to citizens to appear before the Claims Court with as little inconvenience and expense to citizens as is practicable." 28 U.S.C. § 173 (1982).

tiff's counsel, Charles L. Abrahams, failed to appear at the Washington, D.C. continuation of the hearing, despite the fact that the court had set the dates for the second portion of the fact-finding hearing at a status conference on September 11, 1991, almost six weeks prior to the commencement date of the hearing in Washington, D.C.

The court first received notice of Mr. Abraham's deliberate refusal to attend the hearing in Washington, D.C. when it received a facsimile transmission from Mr. Abrahams on October 11, 1991, stating that although he understood that this court had denied his request for yet another continuance, he had decided that he would be unable to attend the hearings scheduled to begin four days later. Nonetheless, the hearing was convened as scheduled, on October 15, 1991, but Mr. Abrahams failed to appear. On October 16, 1991, the second day of the hearing in Washington, D.C., the court received another facsimile transmission from Mr. Abrahams, sent from his La Mesa, California office, and bearing his signature, confirming to the court that he had decided not to attend the hearing and, in fact, would not attend. The court was particularly surprised at a statement included in the October 16, 1991 facsimile from Mr. Abrahams which reads: "I had a hearing at 9:00 a.m. this day ..." [9]

Noting for the record the unusual nature of the proceedings which were about to occur, the court decided to continue with the Washington, D.C. portion of the fact-finding hearing, even without the presence of Mr. Abrahams. This decision was made, in part, because it was clear to the court that Mr. Abrahams had deliberately failed to appear at the continuation of the hearing. Furthermore, the court felt that his actions were part of a pattern of delay designed to force the court to reschedule the five hockey player trials set to commence on December 2, 1991. Plaintiff's counsel had previously made repeated requests to delay those trials, all of which the defendant had vigorously opposed. Moreover, numerous witnesses had made complicated and expensive arrangements to appear at the proceedings in Washington, D.C., which had been scheduled almost six weeks earlier, on September 11, 1991, and the court and the defendant had spent many hours preparing for the continuation portion of the hearing. The court, therefore, felt compelled to continue the hearing, as previously scheduled, and to allow the witnesses who were scheduled to appear in Washington, D.C. to testify. In addition, the court felt that because of the serious nature of the ethical charges included in the motion filed by plaintiff's counsel against defendant's counsel, the court should address those charges as quickly as possible.[10]

Although not each detailed in the Motion for Disqualification filed by plaintiff's counsel, during the course of the fact-finding proceedings, seven instances of possible *ex parte* contacts between defendant's counsel and hockey player plaintiffs were identified.[11] The alleged contacts are:

9. The court can only surmise from Mr. Abrahams facsimile submission that Mr. Abrahams may have intended, all along, not to appear at the hearing in Washington, D.C., because Mr. Abrahams had another hearing, in another city in California, also scheduled for October 16, 1991, the second day of the Washington, D.C. portion of the hearing in *Tannahill.*

10. In order not to delay the trials scheduled to commence in Boston in five of the hockey player tax refund cases (*Douglas R. Favell, Jr. v. United States,* No. 525–76; *Gilles Marotte v. United States,* No. 531–76; *Frederick E. Speck v. United States,* No. 42–77; *Garnett E. Bailey v. United States,* No. 122–77; and *John J. Hanna v. United States,* No. 424–77), this court issued its Opinion on plaintiff's counsel's motion to dis-

qualify defendant's counsel orally on November 25, 1991, at a pretrial conference. This written Opinion reconfirms that oral Opinion and reduces that oral disposition to writing. The court has found that because of the number of actions involved in these related hockey player tax refund cases, and the frequent disagreements between counsel over the years, it is best to proceed in these cases, whenever possible, in writing, *so as to leave no room for further disagreements as to what has transpired in the past.*

11. Counsel for the plaintiff specifically had raised only two of the allegedly *ex parte* communications in his motion. The other instances were identified by the court during the course of the fact-finding proceedings.

1. A telephone call from plaintiff Peter Stemkowski and his accountant, Fred Geller, to defendant's counsel.[12]

2. A telephone call from plaintiff Peter Stemkowski and David Clark, Esq. to defendant's counsel.

3. and 4. Two telephone calls from plaintiff Carey Holbrook to defendant's counsel.[13]

5. A telephone call from plaintiff Donald Tannahill to defendant's counsel.

6. An attempted telephone call placed by defendant's counsel to plaintiff Donald Tannahill, during which no contact was made because Mr. Tannahill was not there to receive the call, although defendant's counsel left a message that he had called, and Mr. Tannahill then returned the call.

7. A telephone call from Steve Frank, Esq., on behalf of plaintiff William Keough, to defendant's counsel.

## FACTS

### *The Seven Alleged Impermissible Contacts with Plaintiffs*

1. Telephone Call from Mr. Geller and Plaintiff Stemkowski to Defendant's Counsel

According to testimony presented at the hearing, in September of 1989, the attorney for the defendant received a call from Mr. Fred Geller,[14] a certified public accountant, who represented Peter Stemkowski, a plaintiff in the related hockey player tax refund cases.[15]

Plaintiff's counsel has asserted, however, that Mr. Geller's representation of Mr. Stemkowski did not give Mr. Geller the authority to act as counsel in the cases filed on behalf of Mr. Stemkowski in the

United States Claims Court. Furthermore, plaintiff's counsel asserts that once contacted, defendant's counsel should have informed Mr. Stemkowski and Mr. Geller that it was not ethically proper for them to discuss the cases with anyone other than Mr. Abrahams, who was listed as attorney of record in the cases filed in this court.

In his testimony regarding the September, 1989 telephone conversation, Fred Geller stated that he called defendant's counsel because he was unable to complete an agreement he was negotiating with the Internal Revenue Service (IRS) to resolve Mr. Stemkowski's 1976–1977 tax year. Mr. Geller testified that Mr. Dombrowski, a Senior Trial Attorney for the Chief Counsel's Office of the IRS in the San Diego District Office, told Mr. Geller that he could not complete any agreement with the IRS due to the outstanding case pending in the United States Claims Court involving that same tax year. Mr. Dombrowski indicated that Mr. Geller should contact the attorney for the defendant in the Claims Court case, and gave the defendant's counsel's direct dial telephone number to Mr. Geller. Mr. Geller's exact testimony in this regard was as follows:

> I had reached an agreement with Thomas Dombrowski who is counsel to the Internal Revenue in San Diego area in regard to the resolution of the 1976–1977 tax cases under mitigation statute. And we had reached an agreement and Mr. Dombrowski had called me and indicated to me that he could not complete that agreement because there was an outstanding case which I had no knowledge of prior to his telling me this by Mr. Stemkowski. And Mr. Dombrowski indicated that I should be in touch with ... [defendant's counsel] in Washington and

---

12. On October 2, 1991, the court dismissed the Complaints in both pending cases captioned *Stemkowski v. United States*, Case No. 262–77 and Case No. 482–86, after Mr. Stemkowski filed a Notice B in each case.

13. On January 15, 1992, the court dismissed the Complaints in the pending cases filed on behalf of Terry and Carey Holbrook, Case No. 484–77 and Case No. 491–89, after both Mr. and Mrs. Holbrook filed a Notice B with the court.

14. Mr. Geller impressed the court as a genuine and very experienced professional in his field. His testimony was thoughtful and he was credible throughout his presentation.

15. The Complaints filed in the United States Claims Court with Mr. Stemkowski's name in the caption were signed by Charles L. Abrahams, as "Attorney for Plaintiff" in Case No. 262–77, and as "Attorney for Plaintiffs" in Case No. 482–66.

provided me with the telephone number of ... [defendant's counsel] so that I could obtain the necessary information with regard to the case that was outstanding at that time.

Mr. Stemkowski's testimony at the hearing corroborated Mr. Geller's testimony that neither Mr. Stemkowski nor Mr. Geller had knowledge of the claims pending before the United States Claims Court when they began to negotiate settlement with the IRS in San Diego. Mr. Stemkowski testified as follows:

> [W]hen we were coming hopefully to an end to the tax situation, we were informed that there were some claims with my name on them, and we were informed about that. Mr. Geller and myself were very surprised at that, and we asked for copies, that were sent to us, to verify that, because we didn't know anything about it. Mr. Geller was completely dumbfounded when we saw '69, '72—all these years that we knew nothing about.

Mr. Stemkowski stated that he called defendant's counsel in the hope of resolving his tax situation. Mr. Stemkowski stated, "I felt at that time that if I was going to resolve my tax situation, the one person that we could hopefully get some results from, because of red tape, would be ... [the defendant's counsel]."

When Mr. Geller called defendant's counsel, Mr. Stemkowski was present on a speaker phone. At the hearing, the defendant's counsel testified that he confirmed with Mr. Geller that Mr. Stemkowski had two cases pending in the United States Claims Court, and that he sent Mr. Geller copies of the Complaints in each case.

Mr. Geller also testified that at the time of the conversation with defendant's counsel, he thought Mr. Abrahams' power of attorney had been revoked. Mr. Geller stated:

> I had spoken to ... [defendant's counsel] about how to go about getting Charles Abrahams off the case. I remember it

was a '86 or '87 case was the last case filed where Charles Abrahams was the attorney for Peter Stemkowski and as far as I knew the power-of-attorney had been revoked. I could not understand how he [Mr. Abrahams] could have filed a case for Peter Stemkowski.

The testimony of both Mr. Geller and defendant's counsel [16] indicates that defendant's counsel told Mr. Geller that he could not discuss the merits of the case in the United States Claims Court while Mr. Abrahams was listed as the attorney of record. Mr. Geller specifically stated that defendant's counsel "refused to discuss with us how to resolve the case that I had outstanding with Mr. Dombrowski." Mr. Geller further stated that "[t]here was no discussion about the merits because we did not know—we didn't know the contents of the case. And there was one case that we had no knowledge of at all." Mr. Geller added that Mr. Stemkowski did not speak and that he [Mr. Geller] "did all the speaking because in some measure it was beyond Mr. Stemkowski's understanding of the tax law or the law."

2. Telephone Call from Mr. Clark and Mr. Stemkowski to Defendant's Counsel

In December, 1989, defendant's counsel received a telephone call from David Clark, Esq., who indicated that he was an attorney with a law firm in San Diego, and was representing Peter Stemkowski. Plaintiff's counsel has asserted that Mr. Clark did not have authority to act for the plaintiff, Stemkowski, in the cases filed in the United States Claims Court. Mr. Abrahams further maintains that defendant's counsel should have informed Mr. Clark that it was not ethically proper for the plaintiff to discuss the Claims Court cases with anyone other than Mr. Abrahams, who was listed as attorney of record on the cases filed by Mr. Stemkowski in this court.

---

**16.** As a result of an opportunity to observe defendant's counsel under oath during the time he was on the stand, the court has concluded that defendant's counsel is a sincere professional, who takes his responsibility as an officer of the court seriously. He presented credible and deliberate testimony, which the court found helpful and believable.

Defendant's counsel testified that Mr. Clark did not indicate to him that Mr. Stemkowski was present on the phone at the time of the call, and that he, defendant's counsel, did not learn that Mr. Stemkowski was listening in on the conference call until Mr. Stemkowski testified at the hearing in Washington, D.C.

Defendant's counsel testified that, during the call, Mr. Clark stated that Peter Stemkowski had wanted to have Mr. Abrahams withdrawn as his counsel in the Untied States Claims Court. Defendant's counsel testified: "Mr. Clarke had told me they had sent Mr. Abrahams a motion to substitute, have Mr. Abrahams substituted, and Mr. Abrahams refused to sign it. So they wanted to know what they needed to do next to get Mr. Abrahams off the case." Since he was unfamiliar with Claims Court practice, Mr. Clark asked defendant's counsel to explain the proper procedure for withdrawal of counsel. Defendant's counsel also testified that Mr. Clark told him that Mr. Abrahams had been sent a motion to substitute in the Stemkowski cases, but that Mr. Abrahams had refused to sign it.

### 3. & 4. The Two Telephone Conversations From Carey Holbrook to Defendant's Counsel

During May, 1991, Carey Holbrook [17] called defendant's counsel twice. According to the testimony of both Mrs. Holbrook and defendant's counsel, Mrs. Holbrook placed a telephone call to defendant's counsel, on counsel for the defendant's direct line at the Department of Justice, to discuss a letter which she had received in the mail from Mr. Abrahams, which included the following language:

**17.** As a result of an opportunity to observe Carey Holbrook during her testimony at the hearing, the court concluded that she was a sincere individual who was trying in all instances to respond truthfully to questions which were posed to her.

**18.** Carey Holbrook was a plaintiff in the case of Terry & Carey Holbrook (husband and wife), Case No. 491–89, and Terry Holbrook was the plaintiff in Case No. 484–77. The Complaints filed in this court were both signed by Charles L. Abrahams, as attorney for each plaintiff. Mr.

To dismiss this action [the one filed in the United States Claims Court] would be a breach of our agreement [between Abrahams and Holbrook] and would entitle me [Mr. Abrahams] to receive from you the full value for my services and costs. I have spent over $50,000 in costs and over the last 15 years have probably devoted full time for a period of two years on your matters.

At the hearing, as an explanation of why she called defendant's counsel, and not Mr. Abrahams, Mrs. Holbrook testified:

I had recently received a letter from my attorney, Mr. Abrahams ... in regards to the case pending in the Claims Court and I was very upset with the letter and I didn't want to call my own lawyer and I wanted to try and get some answers and a better insight as to what was happening with my case.

Furthermore, Mrs. Holbrook indicated that she was unaware formal legal actions were pending in the United States Claims Court, and that her claims were referred to as lawsuits, until after she read over the deposition she gave on August 22, 1991 in Cleveland, Ohio in regard to the hearing on the Motion for Disqualification.[18] She stated:

It was never referred to me as a lawsuit. In this letter he [Mr. Abrahams] refers to it as a complaint. In other letters he's referred to it as just like an amended claim. Not until I read over my deposition from Cleveland did I ever realize that it was referred to as a lawsuit.

Mrs. Holbrook explained that at the time she placed the call to defendant's counsel, she was upset. She testified, "I was not happy with Mr. Abrahams and I thought I had broken off all ties with him. And to

Terry Holbrook was present in the courtroom at the start of the proceedings, but did not testify at the fact-finding hearing. More recently, on December 19, 1991, the Office of the Clerk of the United States Claims Court received from Carey and Terry Holbrook a Notice B indicating that each plaintiff asked to have their hockey player tax refund cases dismissed from this court. In an Order issued on January 15, 1992, all cases filed on behalf of Carey and Terry Holbrook were dismissed by the court, as requested by those plaintiffs.

get this letter, I felt like I was being forced into retaining him as my attorney because if I didn't, I knew he would come after me and sue me." Mr. Abrahams, however, maintains that he had been given the authority to bring lawsuits in the United States Claims Court on behalf of Terry and Carey Holbrook, based on an alleged power of attorney form given to Mr. Abrahams he claimed was filed with the amended return and a general power of attorney Mr. Abrahams claims to have received from the Holbrooks.[19]

Although Mr. Abrahams argues that the telephone contacts with Mrs. Holbrook were made "intentionally and primarily to discredit Counsel," the testimony of both defendant's counsel and Mrs. Holbrook clearly indicate that it was Mrs. Holbrook who initiated the telephone calls. Mrs. Holbrook testified that she first called the United States Claims Court, in an effort to speak with the judge assigned to the Holbrooks' cases. However, the person who answered the telephone in the Clerk's Office of the United States Claims Court told her that she should not speak directly with the judge and gave her defendant's counsel's direct dial number at the Department of Justice.

Mrs. Holbrook testified that when she told the defendant's counsel who she was, the defendant's counsel informed her that Mr. Abrahams was still listed as her counsel, and that she should call him. Mrs. Holbrook and defendant's counsel testified that in the first call Mrs. Holbrook told defendant's counsel about her dissatisfaction with Mr. Abraham's representation of her, her fear of releasing Mr. Abrahams as her attorney of record, her fear of dismissing the lawsuits because she feared that Mr. Abrahams would sue her for fees, and her concern that according to her letter from Mr. Abrahams she could be held liable for out of pocket expenses exceeding $50,000. Mrs. Holbrook testified that: "When he told me to call Mr. Abrahams, I told him I didn't want to call him; that I didn't want him to represent me on the case; that I've had nothing to do with the man, I didn't trust the man, and that isn't there some other way I can handle this." Defendant's counsel also described how, early in the conversation with Mrs. Holbrook, she launched into a discourse about her fear and displeasure with Mr. Abrahams "[b]efore I really had a chance to say anything...."

According to Mrs. Holbrook's testimony, it was she who then asked defendant's counsel for advice as to what she should do. The testimony of both Mrs. Holbrook and defendant's counsel is consistent and indicates that defendant's counsel told Mrs. Holbrook that he could not give her any advice as long as Mr. Abrahams was listed as her attorney of record. Mrs. Holbrook's testimony confirms defendant counsel's statement that he did not discuss the merits of the case:

> I was very upset because I could tell I wasn't going to get any help from ... [defendant's counsel] at this point either. I told him I felt like I was being backed into a corner. I've got Mr. Abrahams threatening to sue me if I don't, you know, proceed with this case. The government isn't allowed to help me. And I said I really feel like I'm being shoved into a corner and I have nowhere to turn.

Defendant's counsel testified at the hearing that he thought Mr. Abraham's representations constituted a "serious subversion of the court's process," which he had an obligation to report to the court. Therefore, in an effort to apprise the court of the existence of Mr. Abrahams's letter to plaintiff Holbrook, defendant's counsel asked Mrs. Holbrook to mail him a copy of the letter, realizing that the attorney-client

---

**19.** At the hearing, however, Carey Holbrook testified that she did not remember ever signing a power of attorney to Mr. Abrahams. During the San Diego portion of the hearing on this motion, Mr. Abrahams stated to the court that neither he, nor the Holbrooks, have the original or a copy of the alleged power of attorney.

Consequently, based on the record of these proceedings, in which it becomes the word of Mr. Abrahams against the word of Carey Holbrook, and no written record of a power of attorney has been located, the court cannot conclude that the power of attorney was in fact ever executed.

privilege was hers, not Mr. Abrahams', to assert. Defendant's counsel stated that although Ms. Holbrook agreed at first to send a copy of the letter to him, she later changed her mind.

According to the testimony of both defendant's counsel and Mrs. Holbrook, in a second telephone call placed by Mrs. Holbrook to defendant's counsel, a day or two later, Mrs. Holbrook stated to defendant's counsel that she and her husband had discussed the letter defendant's counsel had requested and had decided not to send a copy to defendant's counsel for fear that Mr. Abrahams would react by suing them. Mrs. Holbrook made the following statement about the letter:

> I agreed to send it, but then the more I thought about it my number one fear was having Chuck [Mr. Abrahams] come after me to sue me, and to me that was putting myself in a more dangerous position. Plus, if Chuck [Charles Abrahams] really was going to get anywhere with these cases, I didn't think it was right of me to hurt all the other hockey players involved in the case.

On May 10, 1991, after defendant's counsel's second conversation with Mrs. Holbrook, defendant's counsel submitted to the court a motion for leave to file a status report in the related *Favell, Marotte, Speck, Speer, Bailey* cases, and in all the other related hockey player tax refund cases. This court granted the motion and the status report was filed on May 28, 1991. The status report apprised the court of the conversations between defendant's counsel and Mrs. Holbrook, but did not give the Holbrook's name, as they had indi-

cated that they did not want their identity revealed.

### 5. Telephone Call from Donald Tannahill to Defendant's Counsel

In June, 1989, plaintiff Donald Tannahill called defendant's counsel.[20] According to the testimony of defendant's counsel, Mr. Tannahill called to ask defendant's counsel to explain the February 25, 1991 court Order, a copy of which Mr. Tannahill had received in the mail.[21] Mr. Tannahill testified that he first called information in Washington, D.C. in order to get the phone number of the Department of Justice. When he called the Department of Justice, he talked to one or two persons in an attempt to reach defendant's counsel.

Mr. Abrahams asserts that defendant's counsel should have informed Mr. Tannahill to speak with Mr. Abrahams. Mr. Abrahams also argues that defendant's counsel should have informed Mr. Tannahill about certain aspects of the pending case, including the fact that there was a signed refund claim attached to the Complaint.

At the hearing, defendant's counsel testified that Mr. Tannahill had called on defendant's counsel's direct line, and that when he received the call, defendant's counsel did not immediately recognize the name or realize that Mr. Tannahill was one of the plaintiffs in the hockey player cases. Defendant's counsel further stated that Mr. Tannahill indicated that he had only hired Mr. Abrahams to file a tax return for him for one year and that he had not spoken to Mr. Abrahams for over fifteen years. Moreover, he stated that he had not hired Mr. Abrahams to file any suit in the United

**20.** One case was filed in the United States Court of Claims on behalf of Mr. Tannahill, Case No. 147–77. The Complaint was signed by Charles L. Abrahams, attorney for plaintiff.

**21.** The February 25, 1991 court order addressed the need for each plaintiff to "evaluate his and/or her intention to prosecute their lawsuits." Given the concerns which had been raised by several of the plaintiffs in the related hockey player tax refund cases regarding their desire to continue their cases, their knowledge of their lawsuits or their desire to have counsel for the plaintiffs, Mr. Abrahams, continue as

attorney of record (see footnote 3, above), each plaintiff was to file a Notice A if he/she desired to continue to prosecute the case or each plaintiff was to file a Notice B if he/she wanted the court to dismiss their claims.

Whereas, the court mailed a copy of the February 25, 1991 court Order to each plaintiff whose address was listed on the pleadings, the court also ordered the plaintiff's counsel, Charles L. Abrahams, to mail a copy of the Order to any plaintiff for whom the only address listed on the pleadings on the file with the court was the office address of Mr. Abrahams.

States Claims Court, and that this was the first time that he had ever heard about the suit pending in this court. Mr. Tannahill testified that one of the reasons he called defendant's counsel was that he noticed that his name, Tannahill, does not appear on the court Order that he received in the mail. Mr. Tannahill said:

I was asking him to explain to me basically what I was involved in and what this was. And he explained that I was a plaintiff ... in a claim in the United States Claims Court and that there were a number of hockey players that were involved in ... the claim.

Mr. Tannahill's testimony clearly reveals that he was unaware and confused about the case that was filed in his name in this court:

[I]nitially I wasn't clear if I was a plaintiff or if I was a defendant.... the fact that my name didn't even—didn't appear on that actual order—and I think that I may have asked him that question—you know—again, how I was involved.... I'm sure I expressed some ... concern that I didn't know what this was and that I was involved in something.

According to Mr. Tannahill's testimony at the hearing, during the telephone conversation with defendant's counsel when he, Mr. Tannahill, asked what the suit was about, defendant's counsel merely stated that it was a tax refund suit, but declined to discuss the merits of the case, telling the plaintiff that he could not do so while Mr. Abrahams was listed as his attorney of record. Mr. Tannahill testified that defendant's counsel did not ask him any facts about the information contained in his tax returns and amended returns for 1970 and 1971, that defendant's counsel did not threaten him in any way, and that although defendant's counsel did not advise Mr. Tannahill to call Mr. Abrahams, he certainly did not tell him not to talk to Mr. Abrahams or to get another lawyer. Moreover, Mr. Tannahill testified that defendant's counsel did not tell him to dismiss his law suit.

6. Attempted Telephone Call from Defendant's Counsel to Donald Tannahill and Subsequent Telephone Call from Mr. Tannahill to Defendant's Counsel

Shortly after the first conversation between defendant's counsel and Mr. Tannahill, defendant's counsel tried to reach Mr. Tannahill by phone, but was unable to, and left a message. Mr. Tannahill testified that he tried to return the call to defendant's counsel on the same day, but that defendant's counsel was not in, and that he declined to leave a message on the answering machine in defendant's counsel's office. Mr. Tannahill stated that he then returned defendant's counsel's call on the following morning, at which time defendant's counsel requested Mr. Tannahill to sign a declaration reflecting their conversation and the fact that Mr. Abrahams had not spoken to Mr. Tannahill in fifteen years. Mr. Tannahill stated that he would prefer to send a letter, and defendant's counsel agreed. Mr. Tannahill testified that he prepared a letter in his own words, which he then sent to defendant's counsel, of his own free will.

At the hearing, defendant's counsel testified as follows regarding his reasons for, and the circumstances surrounding, his attempt to contact Mr. Tannahill by phone:

Basically, the first conversation was not that long. I then thought about it. Because he had specifically stated that he had not hired Mr. Abrahams to file this suit and knew nothing about it. I called him back, and then he called me back. He was out, and I left a message. And he called me back. And I asked him if he would sign a declaration confirming what he had told me in our first telephone conversation. And he said well, he was a little concerned about signing a declaration, a legal document. And he asked me well, would a letter be good enough. And I said that a letter would be fine.

Mr. Tannahill explained why he volunteered to send a letter rather than a signed declaration in the following testimony:

I think that I volunteered to do that, and I didn't want to sign a declaration. To me, again—you know—there's some—it has other—it just seems so—much more formal, legal, and to me the next step, and easier was to ask him—you know—suggest that I would send him a letter.

Defendant's counsel testified that he intended to use the document he requested from Mr. Tannahill to apprise the court that there was a plaintiff who had indicated specifically that he did not know that he was a party to a hockey player tax refund suit. The letter that Mr. Tannahill sent to defendant's counsel later became an exhibit to a declaration of defendant's counsel, which was attached to Defendant's "Motion for Sanctions Under RUSCC 11," filed in this court on June 12, 1991. At the hearing, defendant's counsel testified that the motion was filed with the court for two purposes: first, to apprise the court of the conversation that he had with Mr. Tannahill; second, to apprise the court of what defendant's counsel considered a violation of RUSCC 11, in that a Complaint had been filed with the court which indicated that Mr. Tannahill wanted to recover judgment against the United States, whereas the plaintiff did not even know that a lawsuit had been filed.

Mr. Abrahams contends that defendant's counsel should not have placed a call to Mr. Tannahill, and that such active participation on defendant's counsel's part requires severe sanctions. Mr. Abrahams further asserts that the defendant's "motive to discredit Counsel has been a part of a pattern of actions by the Department of Justice to deprive the hockey player plaintiffs of their entitlement to refunds."

7. Telephone Conversation from Steve Frank, Esq., on behalf of Plaintiff, William Keough, to Defendant's Counsel

During the Spring of 1991, Mr. Steve Frank, Esq., called defendant's counsel in his office at the Department of Justice. Defendant's counsel testified that Mr. Frank identified himself as an attorney representing William (Ty) Keough, a plaintiff in one of the related hockey player tax refund cases. Defendant's counsel further testified that Mr. Frank stated that he and his client, Mr. Keough, were unaware that the Claims Court suit had been filed and asked defendant's counsel to explain the nature of the suit.[22] Mr. Abrahams argues that it was the obligation of defendant's counsel to inform Mr. Frank that Mr. Keough should call his attorney of record, Mr. Abrahams.

Defendant's counsel testified that Mr. Keough was not a party to the telephone conversation. Defendant's counsel testified that he told Mr. Frank that indeed a suit was pending in the United States Claims Court in which Mr. Abrahams was listed as counsel of record. Mr. Frank then told him that he would call Mr. Abrahams to find out what was going on.

DISCUSSION

Charles L. Abrahams, plaintiffs' attorney in the related hockey player tax refund cases, including *Tannahill v. United States*, has argued that defendant's counsel should be disqualified from further representation in these cases because of allegedly impermissible *ex parte* contacts with hockey player plaintiffs who Mr. Abrahams claims to represent in the cases filed in this court. The law pertinent to reviewing allegations of *ex parte* conversations and contact by counsel for one party in a case, in which the other party to the case is represented by counsel, includes the Model Rules of Professional Conduct of the American Bar Association, which has been adopted in the United States Claims Court by Rule III, Appendix F of the Rules of the United States Claims Court; the Rules of Professional Conduct of the Bar to which

---

**22.** When asked during the hearing if he had authorized Mr. Abrahams to file a lawsuit in the United States Claims Court, Mr. Keough stated, "I signed various forms at the time that Charles Abrahams was my tax preparer. I couldn't tell you one way or the other." Mr. Keough also said that he was unaware, or could not recall, that there was any mention that Mr. Abrahams would file a lawsuit in the Claims Court against the United States government. The lawsuit filed in Mr. Keough's name was signed by Charles L. Abrahams, attorney for plaintiff.

defendant's counsel is admitted to practice (in this case, the Rules of the Supreme Court of Louisiana) and relevant case law.

Rule 4.2 of the Model Rules of Professional Conduct,[23] which addresses communications made with persons represented by counsel, states:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Rule 4.2 of the Rules of Professional Conduct of the Supreme Court of Louisiana (1990), which also addresses communications made with persons represented by counsel, states:

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has

the consent of the other lawyer or is authorized by law to do so. A lawyer shall not effect the prohibited communication through a third person, including the lawyer's client.

Thus, Rule 4.2 of the Rules of Professional Conduct of the Supreme Court of Louisiana, are substantially the same as Rule 4.2 of the Model Rules of Professional Conduct, except for the addition of the last sentence in the Louisiana provisions which prohibits communication through a third person.[24]

Defendant maintains that certain key elements must first be proven before there is a violation of Model Rule 4.2. First, defendant argues that it must be proven that the party was, in fact, represented in the matter by another lawyer. The court in *United States v. Guerrerio*, 675 F.Supp. 1430 (S.D.N.Y.1987), stated that "DR 7–104(A)(1) applies only when a party is represented by counsel." *Id.* at 1432 n. 2.

---

**23.** Over forty states have adopted the Model Rules of Professional Responsibility since their promulgation by the American Bar Association in 1983, although some states have added significant variations to the Model Rules. Prior to 1983, the majority of state and federal jurisdictions had adopted the Model Code of Professional Responsibility of the American Bar Association, which was promulgated by the American Bar Association in 1969.

Rule 4.2 of the Model Rules of Professional Responsibility is "substantially identical to DR 7–104(A)(1) of the Model Code of Professional Responsibility." Model Rules of Professional Conduct Rule 4.2 model code comparison (1984). DR 7–104(A)(1) of the Model Code of Professional Responsibility states:

(A) During the course of his representation of a client a lawyer shall not:

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

Since D.R. 7–104(A)(1) is substantially identical to Model Rule 4.2, case law which refers to either D.R. 7–104(A)(1) or Model Rule 4.2 will both be considered by this court as relevant to the present case.

**24.** In *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1084 (S.D.N.Y.1989), the District Court for the Southern District of New York, clearly summarized the purposes of Model Rule 4.2 and included a list of useful sources:

Model Rule 4.2 serves several vital ends. *See United States v. Guerrerio*, 675 F.Supp. 1430, 1437 & n. 14 (S.D.N.Y.1987); ABA Commission on Evaluation of Professional Standards, Model Rules of Professional Conduct Rule 4.2 comment, at 79 (1984); G. Hazard and W. Hodes, *The Law of Lawyering* 434 to 438.2 (1988); *see also* American Bar Association, Annotated Code of Professional Responsibility 331–39 (1979) [hereinafter *Annotated Code* ]. It guarantees fairness in the adversarial system. It prevents unprincipled attorneys from exploiting the disparity in legal skills between attorney and laypeople. It preserves the integrity of the attorney-client relationship. The Rule also protects 'opposing lawyers as well as opposing parties. Lawyer B may have two reasons for not wanting his client to speak to Lawyer A alone. The obvious reason is fear that the client will damage his case by making unwise voluntary statements.... Another reason is fear that the lawyer's own tactics will be compromised, and that his own reputation will suffer as a result.' G. Hazard & W. Hodes, *supra*, at 434–35; *see Annotated Code, supra*, at 332–33. Although breaches of Model Rule 4.2 might not *necessarily* require disqualification (in contrast to the Canons 4 and 5 situations), courts considering violations of the Rule cannot abdicate their roles as guarantors of fair process. If a lawyer's violation of Model Rule 4.2 might taint the trial, the lawyer should be disqualified.

**162**

The defendant further asserts that it is the duty of the party claiming an attorney-client relationship to prove such a relationship. In *Walker International Corp. v. United States*, 554 F.2d 464, 466, 64 CCPA 111 (C.C.P.A.1977), the court stated that although "a statement by an attorney may ordinarily be sufficient to establish his right to appear on behalf of a litigant, that right is subject to the 'diligent supervision' of the court in the management of its business." Therefore, although Mr. Abrahams testified as to his attorney-client relationship with hockey player plaintiffs, and subsequently stated to the court: "But I testified, under oath, I told all my clients that I would be filing a complaint in the United States Claims Court," Mr. Abrahams still has the burden of proving that an attorney-client relationship exists in this court, based on the numerous occasions which have occurred throughout the related hockey player tax refund cases when plaintiffs have raised questions regarding their knowledge of the pending lawsuits or their desire to have Mr. Abrahams continue to pursue their interests. Defendant further maintains that the fact that a person executed a power of attorney, which authorized an attorney to represent him/her before an administrative body, also does not establish that an attorney-client relationship existed for subsequent litigation in a different court, even litigation involving the same matter.

The defendant also argues that the attorney who makes the allegedly impermissible contact must have known, at the time of the conversation, that the party with whom he is communicating is represented by counsel. For example, the defendant distinguishes the situations in the cases at issue because the plaintiffs, although purportedly represented by counsel, told the defendant's counsel that they had not retained Mr. Abrahams as counsel to represent them in the Claims Court, that the individual listed as counsel of record on the Petitions or Complaints had acted without their consent when filing the lawsuits on their behalf or that they had tried to have Mr. Abrahams removed from their cases, but had been unable to do so. Therefore,

according to the defendant, there was no violation of Model Rule 4.2, or the applicable Codes of Conduct, law, regulation or ethical standards.

The defendant further maintains that there can be no violation of Model Rule 4.2 unless the communication concerns the subject matter of the representation. Defendant asserts that a communication with a party to a lawsuit in regard to whether that party is represented by an attorney in the law suit is not a violation of Model Rule 4.2 because it is not a communication about the subject of the representation. Commenting on Model Rule 4.2, the ABA/BNA Lawyers Manual on Professional Conduct § 71:303 (1990), states "Although it may cover repeated inquiries about whether a party, who the lawyer knows is represented by counsel, has a lawyer, it probably does not prohibit a single inquiry on the subject when there is a reasonable doubt about the representation."

Moreover, the defendant also argues that based on Mr. Tannahill's indication that Mr. Tannahill may not have authorized, and certainly was unaware of, the pending lawsuit, the actions of defendant's counsel in the *Tannahill* case specifically were motivated by a belief that defendant's counsel had committed serious misconduct, which the defendant's counsel believed he had a duty to report to the court under Model Rule 8.3. Model Rule 8.3 states:

> (a) A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

Model Rules of Professional Conduct Rule 8.3 (1984). Rule 8.3 of the Louisiana Rules of Professional Conduct contains similar language:

> (a) A lawyer possessing unprivileged knowledge of a violation of this code shall report such knowledge to a tribunal or other authority empowered to investigate or act upon such violation.

Louisiana Rules of Professional Conduct Rule 8.3 (1990).

The relevant portions of Rule 8.4 of the Model Rules of Professional Conduct and Rule 8.4 of the Louisiana Rules of Professional Conduct, which include the same language, albeit certain other sections of Rule 8.4 of the Model Rules and the Louisiana Rules differ, explain what constitutes attorney misconduct. Both Rules state:

It is professional misconduct for a lawyer to:

.  .  .  .  .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice;

.  .  .  .  .

Model Rules of Professional Conduct Rule 8.4 (1984); Louisiana Rules of Professional Conduct Rule 8.4 (1990).

The defendant claims that the conversations at issue, at a minimum, presented a tension, if not direct conflict, between his obligations under Model Rule 8.3 and Model Rule 4.2. The defendant argues that under such unique circumstances, the duty to inform the court of the possibility of serious misconduct of opposing counsel imposed by Model Rule 8.3 should outweigh concerns of Model Rule 4.2, as long as "the attorney scrupulously avoids any discussion of the merits of the cases, does not attempt to give any advice, and does not obtain any confidential information." Nonetheless, defendant maintains that in this case, the evidence shows that the defendant's counsel committed no violation of Model Rule 4.2 and complied with the obligations imposed on him by Model Rule 8.3.

In support of its overall position, the defendant also cites to a letter dated September 22, 1988, with numerous attachments, from Mr. Thomas Dombrowski, an attorney in the Western Region of the Internal Revenue Service, in San Diego, California, which was sent to the Assistant Attorney General for the Tax Division at the Department of Justice in Washington, D.C., and which defendant's counsel found in his files when he was assigned the hockey player tax refund cases. Defendant's counsel stated that he reviewed the letter from Mr. Dombrowski when he was assigned the "hockey player" cases in late March or early April of 1989, after the government's previous counsel had resigned. This letter referred to several petitioners (including, among others, Block, Stemkowski, Holbrook) who also had filed similar cases in which they had been represented by Mr. Abrahams in the United States Tax Court. The letter described circumstances of Mr. Abraham's involvement with the named petitioners, including the facts that Mr. Block had dismissed Mr. Abrahams, that Mr. Stemkowski was representing himself, that Mr. and Mrs. Holbrook had commenced proceedings to have Mr. Abrahams removed as their attorney and that Mr. and Mrs. Holbrook, in fact, had convinced the Tax Court to vacate a decision it had entered as a result of Mr. Abrahams's representation.

The defendant asserts that as a result of reading the letter from Mr. Dombrowski and further conversations with Mr. Dombrowski, defendant's counsel had good cause to believe that Mr. Abrahams might also have filed suits in the United States Claims Court without the knowledge or consent of the individuals identified in the letter, including Mr. and Mrs. Holbrook, Mr. Stemkowski, Mr. Block, and Mr. Niekamp, as well as other plaintiffs, including the plaintiff in the instant action, Donald Tannahill. The defendant further asserts that the letter caused defendant's counsel to reasonably assume that even if the plaintiffs knew that a suit had been filed, they might not have been kept apprised of the proceedings.[25]

■ Courts clearly have the authority and the duty to prohibit or remedy litigation practices which raise ethical concerns or may constitute ethical violations. *In re*

**25.** It is clear to this court that prior to the issuance of the court's February 25, 1991 order, the attorney for the plaintiffs did not have current addresses for many of the plaintiffs he purports to represent. He also had admitted to the court on several occasions that he had not had contact with many of the plaintiffs for more than ten years.

*Investigative Grand Jury Proceedings,* 432 F.Supp. 50, 52–53 (W.D.Va.1977) (which stated that the court is responsible to "restrain conduct which has the potential for evolving into a breach of ethics before such conduct becomes ripe for disciplinary action."), *aff'd,* 563 F.2d 652 (4th Cir.1977); *see also In re Complaint of Judicial Misconduct,* 2 Cl.Ct. 255, 260–61 (which found that "judges have a responsibility to the public to police the professional behavior of the officers of their court" and that the imposition of deserved sanctions is necessary to provide deterrence to unprofessional conduct), *petition denied, In re Complaint of Judicial Misconduct by Gleason,* 707 F.2d 1583 (Fed.Cir.1983); *University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 329 (E.D.Pa.1990).

Courts have held that disqualification of an attorney is a drastic, perhaps draconian tactic. *See Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1577 (Fed. Cir.1984) (*disapproved by, Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340, on the issue of the appealability of orders disqualifying counsel, *motion denied,* 474 U.S. 808, 106 S.Ct. 45, 88 L.Ed.2d 37 (1985)); *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir.1982); *University Patents,* 737 F.Supp. at 329; *United States Use of Lord Electric Co. v. Titan Pac. Constr. Corp.,* 637 F.Supp. 1556, 1562 (W.D.Wash.1986). Moreover, the courts have indicated that disqualification is not to be used as a strategic litigation tactic. *Titan Pac. Constr. Corp.,* 637 F.Supp. at 1562. In *Richardson–Merrell, Inc. v. Koller,* 472 U.S. at 436, 105 S.Ct. at 2763, the United States Supreme Court stated, "[w]e share the Court of Appeals' concern about 'tactical use of disqualification motions' to harass opposing counsel." Motions to disqualify are to be viewed with extreme caution because they can be used as techniques of harassment. *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982). Judges should be aware that ruling in favor of disqualification can encourage vexatious techniques and increase cynicism by the public. *Panduit,* 744 F.2d at 1576–77.

■ It is also clear that a violation of professional ethics rules does not automatically trigger disqualification. *W.T. Grant Co. v. Haines,* 531 F.2d 671, 677 (2d Cir. 1976); In *Papanicolaou v. Chase Manhattan Bank, N.A.,* 720 F.Supp. at 1083, the court stated that a court would need to assess the possibility of prejudice at trial which might occur from a violation of professional ethics, prior to ruling on disqualification. As stated in *Grant,* "[t]he business of the court is to dispose of litigation and not to act as a general overseer of the ethics of those who practice here unless the questioned behavior taints the trial of the cause before it." *Grant,* 531 F.2d at 677; *accord Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 836 F.2d 1332, 1336 (Fed. Cir.1988); *Ah Ju Steel Co. v. Armco, Inc.,* 680 F.2d 751, 754, 69 CCPA 161 (1982); *Board of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979).

A variety of courts have held that three competing interests need to be balanced when considering a motion for disqualification: (1) the client's interest in being represented by the counsel of its choice; (2) the opposing party's interest in a trial without prejudice due to disclosures of confidential information; and (3) the public's interest in the scrupulous administration of justice. *Meat Price Investigator's Ass'n v. Spencer Foods, Inc.,* 572 F.2d 163, 165 (8th Cir. 1978); *In re Complaint of Korea Shipping Corp.,* 621 F.Supp. 164, 169 (D.Alaska 1985).

■ Many of the judgments which a judge must make in order to arrive at a ruling on disqualification involve the case by case need to balance the rights of the client, of the court, of the accused counsel and of the public's right to the fair administration of justice. For example, courts must consider both a client's right to be represented by counsel of his/her choice and the opposing party's right to prepare and try its case without prejudice. *University Patents,* 737 F.Supp. at 325. In addition, a court must balance a party's right to choose its own counsel against the need to maintain professional standards. *Doyle v.*

*United States,* 15 Cl.Ct. 150, 151 (1988). A court must be guided by the delicate balance which must be maintained between the client's right of confidentiality and the prerogative of a party to proceed with counsel of its choice. *Panduit,* 744 F.2d at 1576. Moreover, a court must also take into account that disqualification of counsel and substitution of a new attorney, unfamiliar with the case facts and the law will most likely result in delay, which is harmful to the client and to the speedy administration of justice. *See W.T. Grant,* 531 F.2d at 677.

Moreover, "Different ethical rules warrant different cures when breached." *Papanicolaou,* 720 F.Supp. at 1083. A court has a wide range of remedial actions available to it. They range from no action, to a symbolic slap on the wrists, to curative measures designed to minimize or eliminate any possible prejudice at trial, to a ruling to disqualify counsel and report him or her to the appropriate Bar Association and federal and/or state court, and to other appropriate sanctions depending on the court and the actions found to have been impermissible, including monetary sanctions.

For example, in *Meat Price Investigators,* an antitrust action, the circuit court upheld a trial court's decision not to disqualify plaintiff's counsel on the ground that the counsel engaged in *ex parte* interrogation of an officer of the corporate defendant without the authorization or presence of the defendant's counsel. The court held that although plaintiff's counsel "overstepped the bounds of responsible professional conduct, we agree with the district court's conclusion that there was not a sufficient showing of prejudice to warrant the denial to [the plaintiff] of representation by their chosen attorneys." *Meat Price Investigators,* 572 F.2d at 165. The court in that case noted that denial of the motion to disqualify would best serve the administration of justice. *Id.* In *University Patents,* the court concluded that the "draconian" measure of disqualification was not required because there was insufficient evidence that the plaintiff had been so severely prejudiced. However, so as to avoid the possibility that the defendants in

the case profit from the improperly obtained information, the court ordered the production of any statement obtained in the course of the *ex parte* contacts between defendant's counsel and employees of the plaintiff. *University Patents,* 737 F.Supp. at 329. Similarly, in *Cagguila v. Wyeth Laboratories, Inc., Division of American Home Products,* 127 F.R.D. 653 (E.D.Pa. 1989), the court also held that disqualification of the plaintiff's counsel was not warranted on the ground that the attorney took an *ex parte* statement from an employee of the corporate defendant without notifying the defense counsel. The plaintiff, however, was prohibited from using any statement, information or evidence obtained from the employee at trial. *Id.* at 654–55.

On occasion, however, courts have found that violations of Model Rule 4.2 are so severe as to require disqualification of an attorney who took part in the *ex parte* communication. For example, in *Papanicolaou,* 720 F.Supp. at 1080, the court ordered disqualification of an entire law firm, prohibited the use of certain depositions, allowed new counsel the right to retake those depositions and granted the defendant thirty days to secure new counsel. In addition, the court ordered the disqualified law firm to turn over to new counsel its work product generated in the case, which included the results of seven-thousand five-hundred hours of working on the case and review of more than thirty-five thousand pages of documents, as well as almost six-thousand pages of depositions. The court ordered this after the defense attorney engaged in a one and one-half-hour conversation with the plaintiff regarding the merits of the case, prior to a scheduled deposition, without the presence of the plaintiff's counsel. *Papanicolaou,* 720 F.Supp. at 1087–88.

Based on a thorough review of the documents submitted by the parties, the testimony taken at the hearing, and the relevant precedent and Codes of Ethical Conduct, none of the alleged instances of impermissible conduct suggest to this court that it should order defendant's counsel be

disqualified. As is discussed more fully below, in the cases of Stemkowski and Tannahill, defendant's counsel had reason to believe that Mr. Abrahams was not representing those plaintiffs and, even if they were represented by him, nothing which was said in the conversation should, in the opinion of this court, result in disqualification. In the case of Mrs. Holbrook, although defendant's counsel might have had notice that she was represented in the Claims Court by Mr. Abrahams, the conversation defendant's counsel had with her also was not of a nature to lead to his disqualification. And, finally, the conversation between plaintiff Keough's representative and defendant's counsel was extremely brief and no impermissible contact occurred. It is clear that upon being told of Mr. Abrahams's notice of appearance, Mr. Frank immediately decided to call Mr. Abrahams, and no substance was discussed.

At the hearing in San Diego, Mr. Abrahams, who personally testified, under oath, offered considerable testimony and some documentation regarding his authority to act for certain of the plaintiffs during proceedings before the IRS and the Tax Court. He failed, however, to produce a single example of an executed power of attorney specifically designed to authorize the filing of litigation either in the United States Court of Claims or the United States Claims Court, or to continue that litigation for more than fifteen years. This is true despite repeated attempts during discovery and at the hearing by Ms. Coles, representing the defendant, to force Mr. Abrahams to produce and turn over such records or any pertinent documents, if they existed.

One question, therefore, raised for the court's attention is whether these authorizations to represent plaintiffs in their tax claims before the IRS and in the Tax Court can be implied by this court to authorize the filing of litigation in the Court of Claims. Moreover, assuming for argument's sake, that Mr. Abrahams had valid authority to file the lawsuits and to act on behalf of the plaintiffs, the next question for the court to decide is whether that authority had been revoked by any of those plaintiffs.

Much of the testimony offered at the hearing by Mr. Abrahams was vague and evasive. On a number of occasions, he responded to apparently clear questions "I don't understand your question" or "I don't know what your point is," thereby avoiding having to respond to the question actually posed. As evidence of executed power of attorney forms, which he claimed documented his authority, he cited to forms such as Exhibit 19, page 5.20A, which is in reality a Department of the Treasury Standard Form 2848, signed by plaintiff Tannahill. On the fact of that form 2848, the attorney or agent whose name is filled in on the form, in this case Mr. Abrahams, is appointed by the hockey player taxpayer, whose signature appears at the bottom of the page: "As attorney(s) in-fact to represent the tax payer(s) before any office of the Internal Revenue Service with respect to (specify Internal Revenue tax matters and years or periods)." This standard form is clearly an IRS form which limits the authority given to the attorney to appearances on a taxpayer's behalf in offices within the IRS. It does not give authorization to proceed for that taxpayer in the United States Court of Claims, or its successor, the United States Claims Court.

Mr. Abrahams also tried to argue that he explained the extended process of recovering tax refunds to each of the plaintiffs for whom he filed tax returns and represented before the Internal Revenue Service, including an explanation of the need for filing amended returns, receiving two-year letters and, perhaps, of filing petitions, presumably in the United States Court of Claims. However, his testimony falls short of even stating that he asked for or received specific permission to file litigation in the United States Court of Claims or the United States Claims Court. In fact, it appears from the record that the plaintiffs, Mr. Stemkowski, Mr. Tannahill, Mrs. Holbrook, and Mr. Keough, did not even know that Petitions or Complaints on their behalf had been filed in the Court of Claims, or in this court, although each plaintiff acknowledges that Mr. Abrahams had acted as tax

representative for them before the IRS and in the United States Tax Court. Only Mrs. Holbrook stated during the hearing in the *Tannahill* case that she was aware of some activity in the Claims Court, which, however, it is clear from the record, she did not understand.

There is testimony in the record from plaintiff Stemkowski and from his representative, Mr. Geller, that Mr. Stemkowski did not know about the Claims Court actions, that Mr. Stemkowski had fired Mr. Abrahams as his attorney and that plaintiff Stemkowski and his representative, Mr. Geller, both believed that Mr. Abrahams' authority to act on behalf of Mr. Stemkowski had been specifically revoked. Upon discovering the Claims Court litigation, plaintiff Stemkowski also filed a Motion for Removal and Withdrawal of Plaintiff's Counsel in one of his cases on October 4, 1990, which was granted, and the plaintiff was allowed to continue in that action *pro se*. On the date that the court granted plaintiff Stemkowski's motion, the court also ordered that each of the other plaintiffs in the related, hockey players, tax refund cases file either a Notice A or B to indicate if they wished to continue or dismiss their actions. Plaintiff Stemkowski further tried to have Mr. Abrahams removed as counsel in his remaining Claims Court action in the Spring of 1991, when attorney Clark placed the call to defendant's counsel asking how to have plaintiff's counsel removed as the attorney of record. Then, on July 2, 1991, Mr. Stemkowski and his spouse filed a Notice B, in which they sought to dismiss their causes of action, which request was approved by the court on October 2, 1991, together with the dismissal of several of the other hockey player cases.

With respect to the conversation between defendant's counsel and Mr. Fred Geller, the court notes that it was Mr. Geller and Mr. Stemkowski who placed the phone call to defendant's counsel. Defendant's counsel did not contact either Mr. Geller or Mr. Stemkowski. Moreover, Mr. Geller, who stated that he represented Mr. Stemkowski, appeared to the court to be an experienced and sincere professional tax account-ant. And, the testimony at the hearing makes it clear that during the conversation, according to Mr. Geller and Mr. Stemkowski, defendant's counsel carefully avoided discussing the merits of the case. Likewise, there is no indication that defendant's counsel ever tried to improperly influence either Mr. Geller or the plaintiff, Mr. Stemkowski. Defendant's counsel cannot control who places calls to him. It appears, however, that defendant's counsel carefully met his ethical responsibilities by not discussing the merits of plaintiff Stemkowski's cases.

Similarly, the court finds that based on the documents submitted by the parties, the testimony at the hearing, the relevant legal precedent and the applicable ethical codes, disqualification of defendant's counsel as the attorney of record for the defendant, based on the telephone conversation with Mr. Clark and Mr. Stemkowski also is not warranted. Defendant's counsel also did not initiate this telephone call. Rather, it was Mr. Clark and Mr. Stemkowski who placed the conference call to defendant's counsel, although counsel for the defendant testified that Mr. Clark did not tell him during the conversation that Mr. Stemkowski was present on the line and Mr. Stemkowski did not speak during the telephone call. It is clear, therefore, that defendant's counsel did not realize at the time of the call that he was participating in a conversation with a plaintiff. Furthermore, the testimony adduced at trial clearly indicated that defendant's counsel was careful to avoid discussing the merits of the case with Mr. Clark and, as it happens, also with Mr. Stemkowski. No evidence has been produced for the record that defendant's counsel tried to improperly influence Mr. Clark or Mr. Stemkowski.

At the hearing, defendant's counsel testified that he honestly believed that any power of attorney which may have been executed authorizing Mr. Abrahams to act for the plaintiff Stemkowski had been revoked at the time of defendant's counsel's conversation with Mr. Geller and with Mr. Clark. The testimony of defendant's counsel,

which the court found credible reads as follows:

Q. Did Mr. Geller indicate to you that Mr. Stemkowski had revoked Mr. Abrahams's Power of Attorney?

A. Yes. I don't know if he said he had specifically mentioned revoking a Power of Attorney. He did say that they had terminated Abrahams as their attorney, but I can't remember if they specifically said they revoked a Power of Attorney or if they said they had just fired him as his attorney.

Q. Did you have any discussion with Mr. Geller about the merits of Mr. Stemkowski's case at that time?

A. No. I did not. In fact, I told him that, even though they had told me that they had fired Mr. Abrahams as their attorney and did not want him to represent them, I told them that since Mr. Abrahams was still listed as counsel of record on the cases, that I could not discuss the cases with them until they had him withdrawn as counsel of record.

Later in his testimony, defendant's counsel further stated: "The impression that I got was that they had terminated it for everything. Moreover, at the hearing, the defendant introduced a copy of an almost contemporaneous memorandum to the file, dated September 12, 1989, regarding the telephone call received from Peter Stemkowski and his accountant, Fred Geller, on September 8, 1989. The text of the memo is as follows:

On Friday, September 8, 1989, I received a call from Peter Stemkowski and his accountant, Fred Geller. They informed me that they had just learned of the pendency of the case in the Claims Court and that Mr. Abrahams did not tell Mr. Stemkowski that he was going to file the suit. Mr. Abrahams was not authorized to file the suit and was fired as Mr. Stemkowski's attorney in 1980. They wanted to know what they should do to remove Mr. Abrahams as attorney in these cases. I informed [them] that they would have to file a motion to have Mr. Abrahams withdrawn as counsel. I also informed them that I could not discuss the case directly with them until Mr. Abrahams had withdrawn. They asked for copies of the pleadings in the two cases filed by Mr. Abrahams for Mr. Stemkowski and I forwarded copies of those to Mr. Geller.

■ Regarding Mrs. Holbrook, the record reflects a somewhat confused plaintiff who does not understand the legal process in which she has been involved. Until her deposition in Cleveland, on August 22, 1991, she did not understand that she actually was a party to litigation in the United States Claims Court, although she stated she may have known that she was involved in some Claims Court activity. Mrs. Holbrook testified that Mr. Abrahams always referred to the actions as amended claims, and she even thought they were just amended returns. At one point she also testified that: "He's [Mr. Abrahams] threatened me more than after that phone call, but before that I really hadn't heard from him [Mr. Abrahams] in regards to these cases for awhile [sic]. After I had him removed as my counsel for the tax years, I really had nothing to do with him." She also testified that for one of the tax years at issue in the Claims Court, 1975, she even thought the matters had been settled and was surprised to learn of the Claims Court action regarding that year.

Although, originally, on September 23, 1991, well after the alleged improper conversations, the Holbrooks each filed a Notice A in their cases, Mrs. Holbrook testified she did so out of fear of being sued by Mr. Abrahams for fees and costs. Defendant's counsel testified that Mrs. Holbrook repeated several times during their conversations that she was afraid that if she didn't do what Mr. Abrahams said she should, she would have a lawsuit filed against her, and that she even feared calling him. Then, after testifying before the court at the hearing and, upon further reflection, on December 15, 1991, the Holbrooks refiled, this time both husband and wife sending in a Notice B. Consequently, in an Order dated January 15, 1992, the court dismissed the actions in which the Holbrooks had appeared as plaintiffs.

The court also believes that defendant's counsel should not be disqualified as the attorney of record for the defendant based on his contacts with plaintiff Carey Holbrook after reviewing the documents submitted by the parties, the testimony from the hearing, and the relevant legal precedent and ethical codes. In both instances, it was Carey Holbrook who called defendant's counsel. The court carefully noted the demeanor of Carey Holbrook as she testified at trial. It was clear during the proceedings that the cases filed in the United States Claims Court on behalf of her and her husband and her relationship with Mr. Abrahams make her very anxious. She appeared to have a need to discuss and try to understand the legal situation in which she found herself and clearly wanted to resolve the cases as soon as possible. Therefore, this court believes the testimony of both defendant's counsel and of Mrs. Holbrook that when she placed her call to defendant's counsel, it was she who, without allowing defendant's counsel an opportunity to stop her, launched directly into a discourse about her dissatisfaction with her attorney of record and about her desire to resolve her legal situation and her relationship with her attorney. It is also clear from the testimony at the hearing that defendant's counsel avoided discussing the merits of the case with Mrs. Holbrook, and that defendant's counsel did not try to improperly influence the plaintiff while she was on the telephone with him.

The government has maintained that defendant's counsel did not have impermissible, *ex parte* contacts with Mr. Tannahill because at the time of the conversations between plaintiff Tannahill and defendant's counsel, the latter did not believe that Mr. Abrahams represented Mr. Tannahill in the United States Claims Court. At the hearing, Mr. Tannahill testified that he did not see the petition in the Court of Claims at the time it was filed in 1977, but saw it for the first time just prior to his deposition in August, 1991. Mr. Tannahill received a copy of the February 25, 1991 Order, to which was attached the Notices A and B, at his parents' address in Canada in May, 1991, after the court ordered the same to be distributed to each plaintiff. Until May, 1991, however, he testified that he had not received any correspondence on the case from plaintiff's counsel. In fact, he testified that he had not spoken to Mr. Abrahams in sixteen or seventeen years and that he had not retained Mr. Abrahams to represent him in the Court of Claims or in the Claims Court. Furthermore, Mr. Tannahill stated that he might even have said specifically that he was not represented by Mr. Abrahams in his Claims Court action, or that Mr. Abrahams was not authorized to file, when he called defendant's counsel.

Some of plaintiff Tannahill's testimony and actions regarding his relationship with Mr. Abrahams and his desire to press his tax refund claims is somewhat contradictory. In a declaration signed by Mr. Tannahill, prepared by Mr. Abrahams, and only altered slightly by the plaintiff, Mr. Tannahill states, "I do not recall saying that he [Mr. Abrahams] was not authorized to file Amended Returns or to file in the United States Claims Court." The following colloquy in response to a question from the court, however, appeared to the court to be critical:

> THE COURT: ... Mr. Tannahill, take as much time as you need, but please answer my questions. When you spoke to [defendant's counsel]—and I gather there were two conversations that have been referred to in your testimony—did you consider Mr. Abrahams your attorney at that time in the United States Claims Court matter, docket number 147–77?
>
> (Pause)
>
> THE WITNESS: I believe the answer to that is no.

At the hearing, defendant's counsel testified that Mr. Tannahill told him during the first conversation on June 5 or 6, 1991:

> That he had only hired Mr. Abrahams to file a tax return for him for one year. And that he had not talked to him for over fifteen years. And that he had not hired him to file any suit in the Claims Court. And that this was the first time that he had ever even heard of it. And he was rather amazed that his name had

even been on the pleading filed in the Court.

Defendant's counsel had previously filed a Declaration with the court, attached to Defendant's Motion for Sanctions Under RUSCC 11 in the *Tannahill* case, in which he had discussed Mr. Tannahill's lack of knowledge of the lawsuit in the Claims Court. In this Declaration, defendant's counsel stated that he had received a phone call from plaintiff Tannahill on June 6, 1991, in which Mr. Tannahill had said that prior to receiving a copy of the February 25, 1991 Order, he had been unaware of the pending lawsuit. The Declaration also indicated that Mr. Tannahill told defendant's counsel that he had "never hired Mr. Abrahams to act as his attorney in this case," that he had only "hired Mr. Abrahams to prepare his taxes for one year, and terminated the relationship after that time" and that "[h]e has not talked with Mr. Abrahams in over fifteen years," and does not wish to pursue his action in this court. Moreover, according to the Declaration, plaintiff Tannahill indicated to defendant's counsel that he would be filing a Notice B in this court.

On June 12, 1991, plaintiff Donald A. Tannahill did file a Notice B with the court requesting dismissal of all his pending claims in the United States Claims Court. After further consultation with Mr. Abrahams, however, Mr. Tannahill opted to change his mind, and on June 26, 1991, he filed a Notice A opting to remain in the action, and to be represented in the case by Mr. Abrahams. On the Notice A he added the following insert: "The Dismissal (Notice B) I filed was without legal advice and in error. I wish to pursue my claims."

The court finds that with regard to the conversations between plaintiff Tannahill and defendant's counsel, the testimony and documentary evidence presented by defendant's counsel is the most credible. Therefore, based on a careful review of the documents submitted by the parties, the testimony at the hearing, relevant legal precedent, and applicable codes of conduct, the court finds that there is no need to disqualify defendant's counsel as counsel of record based on the telephone calls he received

from Mr. Tannahill. Mr. Tannahill took the initiative to call defendant's counsel for an explanation of a court Order he had received in the mail. It is clear from the evidence that defendant's counsel avoided discussing the merits of the cases with Mr. Tannahill. In addition, there is no indication that defendant's counsel tried to improperly influence Mr. Tannahill during the telephone conversation. Moreover, the court notes that the telephone calls Mr. Tannahill placed in return to defendant's counsel's message to call him did not result in a release of confidential information or result in any prejudice to the plaintiff. There is no indication in the record that anything which was discussed during the conversations between Mr. Tannahill and defendant's counsel could taint a trial in the *Tannahill* case or any of the other related hockey player tax refund cases.

Of the telephone contacts discussed above, the court is most disturbed about the telephone call which defendant's counsel attempted to place to Mr. Tannahill, since this contact was initiated by defendant's counsel. As was discussed above, the court notes, however, that defendant's counsel did not actually make contact by telephone at the time he placed the call, since Mr. Tannahill was not available to receive that call. Instead, defendant's counsel left a message and Mr. Tannahill then, voluntarily, placed a second call to defendant's counsel. It is very clear from the record that Mr. Tannahill willingly spoke to defendant's counsel both times. Moreover, there is no evidence that defendant's counsel exerted any pressure on the plaintiff to speak to him. Defendant's counsel testified that his purpose in trying to place the telephone call to plaintiff Tannahill was to meet the obligations of candor he felt he owed to the court by asking Mr. Tannahill to sign a declaration confirming what the plaintiff had told him in the first telephone call, originated by Mr. Tannahill, including the fact that the plaintiff had not asked Mr. Abrahams to file the suit in the United States Claims Court and that plaintiff knew nothing about the pending action in the Claims Court. Defendant's counsel

did not discuss the merits of the case during either telephone conversation with Mr. Tannahill; nor is there any evidence that defendant's counsel tried to improperly influence Mr. Tannahill during either conversation. In an abundance of caution perhaps, defendant's counsel should not have tried to place a telephone call to Mr. Tannahill, without trying to contact plaintiff's counsel.

The following scenario, as testified to at the hearing, also leads the court to find that it was reasonable for defendant's counsel to conclude that plaintiff Tannahill was not represented by Mr. Abrahams at the time of the telephone calls at issue. According to the testimony of Mr. Tannahill, the first phone call he placed to defendant's counsel occurred on either June 5 or 6, 1991. Also, according to the testimony of Mr. Tannahill, one or two days later, he called defendant's counsel, reached only the answering machine, but did not leave a message. Then, the next Monday, which would have also been in the first or early part of the second week in June, Mr. Tannahill had his second conversation with defendant's counsel. Throughout the course of the hearing, it was clear to the court that Mr. Tannahill was unsure about the nature of the tax proceedings, and about the lawsuit in the United States Claims Court, in particular. Moreover, he asked for time to consult his wife in order to decide whether or not he wished to continue his lawsuit.

When asked by the court at the hearing, whether he had retained Mr. Abrahams to represent him in the United States Claims Court, Mr. Tannahill responded, "I don't believe I have." However, Mr. Tannahill stated that he gave Mr. Abrahams a power of attorney to amend his tax returns and said, "I don't know if this complaint is part of the authorization that I gave you [Mr. Abrahams] to amend my taxes and to try to get a refund for me." Moreover, while admitting that he was confused about the proceedings, Mr. Tannahill also testified that he did not remember signing a power of attorney. In addition, no power of attorney from Mr. Tannahill to Mr. Abrahams was produced at the hearing, and none

appears in the record which specifically authorizes suit in the United States Claims Court.

Mr. Tannahill testified that he chose to have Mr. Abrahams represent him in the present action on the date that he signed the Notice A, stating that he wished to continue his lawsuit presently pending. Mr. Tannahill's Notice A was signed by him on June 24, 1991 and filed with the court on June 26, 1991, after either of the telephone calls with defendant's counsel took place. Consequently, this court believes that it is reasonable to conclude that Mr. Tannahill had not authorized the lawsuit at the time it was filed, that Mr. Abrahams was not representing Mr. Tannahill in the Claims Court action at the time the suit was filed and had not consulted with plaintiff Tannahill in over fifteen years about the lawsuit or anything else, and that the plaintiff decided to see if he could benefit from the lawsuit only after he became aware of it many years after it was filed.

Regarding plaintiff William Keough, the record clearly demonstrates that defendant's counsel did not speak with the plaintiff Keough, nor is any such claim made by either party. Furthermore, Mr. Keough testified that he had never been provided with a copy of the Complaint in the Claims Court litigation and that he could not recall discussing that litigation with Mr. Abrahams. The only remaining question, therefore, is whether defendant's counsel had an impermissible contact with a representative of the plaintiff, Mr. Frank, which is also prohibited under the Model Rules of Professional Conduct of the State of Louisiana.

After careful review of the documents filed by the parties, the testimony at the hearing, and a review of the relevant legal precedent and rules of conduct, defendant's counsel likewise should not be disqualified as the defendant's counsel of record based on his telephone conversation with the attorney for plaintiff William Keough, Mr. Steve Frank. Mr. Frank placed the call to defendant's counsel, asking defendant's counsel to explain the nature of Mr. Keough's Claims Court suit. When defendant's counsel told Mr. Frank that Mr.

Abrahams was the individual listed as attorney of record in the Claims Court action, Mr. Frank stated that he would call Mr. Abrahams to find out more about the case. The conversation with plaintiff Keough's representative was very brief. According to testimony offered at the hearing, upon being informed that Mr. Abrahams was attorney of record, Mr. Frank immediately volunteered that he would contact Mr. Abrahams, ending the conversation with defendant's counsel quickly before any substantive words were exchanged. The testimony from the hearing clearly indicates that defendant's counsel did not discuss the merits of the case with Mr. Frank, and that he did not try to improperly influence Mr. Frank during the telephone conversation.

In conclusion, based on the facts presented and the relevant precedent and ethical codes of conduct, this court concludes that there has not been a sufficient showing that any impermissible *ex parte* contacts took place and certainly no showing of prejudice resulting from any of the above conversations between defendant's counsel and a plaintiff, or his or her representative, to require the disqualification of defendant's counsel from the *Tannahill* case, or any of the other remaining related hockey player tax refund cases. With respect to each conversation at issue, defendant's counsel had reason to believe that the plaintiff was either not represented by Mr. Abrahams in the lawsuit in the Claims Court, or that the plaintiff had tried to dismiss Mr. Abrahams and did not intend to continue to use him as counsel. Each of the telephone calls was brief. Although it is certainly not this court's intention to set a length of time after which a telephone call constitutes an impermissible contact and requires a *per se* disqualification of counsel, none of defendant's counsel's contacts came anywhere near the hour and one-half call which resulted in disqualification in the *Papanicolaou* case. The court makes particular note that defendant's counsel was the recipient of all seven telephone calls, and that the one call he attempted to place did not reach the plaintiff for whom the call was intended. More-

over, because each of the plaintiffs or their representatives placed their calls to the defendant's counsel at his office in the Department of Justice, there can be no question that each caller knew they were talking to an attorney who represented the defendant at the United States Department of Justice. In each of the calls, the attorney for the defendant carefully and deliberately avoided discussing the merits of the case and the evidence clearly shows that he did not try to improperly influence any of the plaintiffs or their representatives. Moreover, in the case of plaintiffs Stemkowski and Tannahill, defendant's counsel had reason to believe that Mr. Abrahams was not that plaintiff's counsel at the time of the conversation.

Although it might have been more prudent for the defendant's counsel not to have tried to place the call to Mr. Tannahill, by himself, the court finds that, among other reasons, because it was unsuccessful, this action could not have prejudiced the plaintiff's case and, therefore, cannot be found to have tainted the proceedings in the *Tannahill* case or in any of the other related hockey player tax refund cases. Given the nature of the telephone system at the Department of Justice, which lists a direct dial number in the Department of Justice telephone directory for defendant's counsel, defendant's counsel could not control when a call was placed to that number. The attorney's duty, therefore, must be to refrain from discussing the merits of a case in which he or she knows a plaintiff is represented by counsel. It appears from the record before the court that defendant's counsel has met this responsibility in each of the situations brought to the court's attention.

Furthermore, the defendant, the United States, has the right to proceed with the counsel of its choice, which in this case is the attorney against whom the attorney for the plaintiffs has leveled the allegations at issue. Disqualification of the government's attorney and substitution of new counsel might well result in harmful delay and expense to the defendant, the United States. As has been previously noted by the court, these related proceedings are all

extremely old and have been on this judge's docket and on the docket of the judge who was previously assigned the cases for many years. When all the factors are balanced, the court believes that there will be no prejudice to either the plaintiff, Mr. Tannahill, or to any of the other plaintiffs in the remaining, related hockey player tax refund cases, resulting from allowing defendant's counsel to resume as the attorney of record in each of these cases. Rather, it is the court's belief that the interests of the United States could suffer substantially if defendant's counsel were to be permanently disqualified and a new attorney had to be assigned and had to become familiar with all the remaining one-hundred twenty (120) hockey player tax refund cases.[26]

### CONCLUSION

It is this court's finding that resumption by defendant's counsel of his duties as attorney of record in the related hockey player tax refund cases is proper. The court, therefore, hereby, reconfirms its earlier, oral denial, on November 25, 1991, of the plaintiff's motion for the disqualification of defendant's counsel.

IT IS SO ORDERED.

---

26. Given the pattern of behavior of plaintiffs' counsel throughout these proceedings and keeping in mind his repeated attempts to delay the commencement of trial in these cases, this court is forced to wonder whether plaintiff's counsel's Motion to Disqualify Defendant's Counsel, in fact, was yet another delaying litigation tactic.