**UNIVERSITY PATENTS, INC.**

**v.**

**Albert M. KLIGMAN, Johnson & Johnson Baby Products Company and Ortho Pharmaceutical Corporation.**

**The TRUSTEES OF the UNIVERSITY OF PENNSYLVANIA**

**v.**

**JOHNSON AND JOHNSON BABY PRODUCTS COMPANY, Ortho Pharmaceutical Corporation and Albert M. Kligman.**

Civ. A. Nos. 89–3525, 90–0422.

United States District Court, E.D. Pennsylvania.

May 7, 1990.

Arthur M. Lieberman, New York City, Shelley Green, Neil J. Hamburg, Howard D. Scher, Philadelphia, Pa., Paul Martin Wolff, Washington, D.C., for plaintiffs.

William J. Taylor, Jr., Philadelphia, Pa., Thomas C. Morrison, David McIntyre, New York City, for defendants.

## MEMORANDUM

WALDMAN, District Judge.

Plaintiffs, The Trustees of the University of Pennsylvania and University Patents, Inc., commenced this action to recover royalties allegedly owed to them by defendant Dr. Albert Kligman for his development and licensing of a medication for photoaged (sun-damaged) skin.

Presently before the court is plaintiff University's motion to disqualify the lawyer representing defendants Johnson & Johnson and Kligman based on certain *ex parte* contacts between that lawyer and various present and former employees of the University of Pennsylvania. Plaintiff also seeks to bar defendants from using any information obtained from these contacts against plaintiff, and to compel the production of any statements obtained during the contacts. Defendants in response have filed a cross-motion to prevent the University from interfering with future *ex parte* contacts of this sort.

An opportunity for hearing and argument was provided on April 27, 1990. For the reasons that follow, plaintiff's motion will be granted in part and denied in part, and defendants' cross-motion will be denied.

## I.

Plaintiff contends and defendants do not dispute that during the fall of 1989 their attorney, Thomas C. Morrison, engaged in *ex parte* verbal communications concerning this litigation with three current University employees: Dr. Edward Stemmler, Professor of Medicine, Dean Emeritus and a former University Executive Vice President; Dr. Gerald Lazarus, Professor and Chairman of the Department of Dermatology; and Dr. Robert M. Lavker, Research Professor of Dermatology. Mr. Morrison also contacted Harvey Miller, an Associate University Trustee and member of the Board of Overseers of the University's Nursing School. He also initiated *ex parte* contact with at least two former University employees who were colleagues of defen-

dant Kligman, Drs. Margaret Wood and Walter Shelley.

Dr. Stemmler states that, after an interview by Mr. Morrison in December 1989, the latter attempted to secure Dr. Stemmler's signature on an affidavit purportedly documenting this interview that contained "inaccurate and argumentative statements which I never made to Mr. Morrison, and failed to include other statements which I did make to him." He declined to execute this affidavit and rejected counsel's invitation to revise it.

On November 14, 1989, Neil Hamburg, counsel for the University of Pennsylvania, met with Mr. Morrison and informed him of the University's intent to join in this action which had been initiated by University Patents, Inc. On December 5, 1989, upon learning of Mr. Morrison's meeting with Dr. Stemmler, Mr. Hamburg wrote to Mr. Morrison, objecting to this *ex parte* communication. Two days after a December 18, 1989 meeting with Mr. Hamburg, at which Mr. Morrison promised to cease *ex parte* communications with University employees, a letter over Dr. Kligman's signature was sent to University Provost Michael Aiken and Medical School Dean William Kelley. The letter asks these gentlemen to meet with Dr. Kligman, "Mr. Morrison and the folks from Johnson & Johnson to discuss the issues raised by this lawsuit." Mr. Morrison acknowledges that he authored this letter.

## II.

■ Because this present dispute concerns questions of professional ethics and the conduct of discovery, federal law applies. Even if the dispute in this diversity action were viewed as substantive in nature, however, the result would be the same upon application of Pennsylvania law.

Rule 14 of the United States District Court for the Eastern District of Pennsylvania provides in relevant part:

"The Code of Professional Responsibility adopted by this court is the Code of Professional Responsibility adopted by the Supreme Court of Pennsylvania as amended from time to time by this state court, except as otherwise provided by specific Rule of this court after consideration of comments by representatives of bar associations within the state."

The Supreme Court of Pennsylvania has adopted Rule 4.2 of the Model Rules of Professional Conduct, which states:

In representing a client, a lawyer shall not communicate about the subject of the representation with a *party* the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

(Emphasis added).

Courts and commentators have noted that Rule 4.2 is designed "to prevent situations in which a represented party may be taken advantage of by adverse counsel; the presence of the party's attorney theoretically neutralizes the contact." *Frey v. Department of Health and Human Services*, 106 F.R.D. 32, 34 (E.D.N.Y.1985); Kurlantzik, *The Prohibition on Communication with an Adverse Party*, 51 Conn.Bar J. 136, 145–46 (1977). *See also* Leubsdorf, *Communication with Another Lawyer's Client: The Lawyer's Veto and the Client's Interest*, 127 U.Pa.L.Rev. 683 (1979). The Official Comment to Rule 4.2, which explains what is meant by a "party" where, as here, an institutional defendant is involved, provides:

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, *and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.*

(Emphasis added). Just as an adversary's attorney may take advantage of an individual party either by extracting damaging statements from him, by dissuading him from pursuing his claim, or by negatively influencing his expectations of succeeding

on the merits, the same may occur in the case of an institutional or corporate party.

■ The court is unpersuaded by plaintiff's assertion that Rule 4.2 shrouds every custodian, cafeteria worker and receptionist simply in light of their mantle as "corporate employee." Plaintiffs rely on *Cagguila v. Wyeth Laboratories*, 127 F.R.D. 653 (E.D.Pa.1989), the only precedent applying Pennsylvania law. In *Cagguila*, the court found that, while it did not "seem clear" that the employee who was contacted *ex parte* fell under the prohibitions in the Comment, because his conduct involved "the matter in representation" the contact was inappropriate. *Id.* at 654. This court agrees that there may be cases in which conduct is inappropriate even though the letter of the Official Comment is not violated.

■ At the same time, the court is not persuaded that the drafters intended to restrict the application of the Rule to those cases where an officer, "alter ego" or "control group" member of the organization is contacted *ex parte*. *Compare Monahan v. Johnson*, 128 F.R.D. 659 (N.D.Ill.1989) (adopting such an "alter ego" theory), and *Frey v. Dept of Health and Human Services, supra* (same). Defendants also rely on *Morrison v. Brandeis University*, 125 F.R.D. 14 (D.Mass.1989) (balancing need to gather informal information against need for effective representation), and *Mompoint v. Lotus Development Corp.*, 110 F.R.D. 414, 419–20 (D.Mass.1986) (same), as well as two recent cases in which Magistrate Collings' balancing approach was employed. *See Lizotte v. NYCHHC*, 1990 U.S.Dist. LEXIS 2747 (S.D.N.Y. March 13, 1990); *Siguel v. Trustees of Tufts College*, 1990 WL 29199, 1990 U.S.Dist. LEXIS 2747 (D.Mass. March 12, 1990). Even if this court were inclined to adopt the case-by-case balancing test utilized by the magistrates in those cases, it notes emphatically that it was the court, not counsel, that did the balancing. *See Morrison*, 125 F.R.D. at 18 n. 1. In this case, counsel acted unilaterally.

Moreover, in *Lizotte* and *Siguel*, the court defined and significantly limited the scope of permissible communications by requiring counsel first: (1) to disclose his representative capacity to the interviewee; (2) to state his reasons for seeking the interview; (3) to inform the individual of his or her right to refuse to be interviewed; and (4) to inform the person that he or she could have their own counsel present. There has been no showing that counsel here complied with all of these requirements.

■ The underlying policy and Official Comment to the Rule make clear that it was intended to forbid *ex parte* communications with all institutional employees whose acts or omissions could bind or impute liability to the organization or whose statements could be used as admissions against the organization, presumably pursuant to Federal Rule of Evidence 801(d)(2)(D). *See Chancellor v. Boeing Co.*, 678 F.Supp. 250, 251–53 (D.Kan.1988). As such, the prohibition does not appear generally to encompass former employees, although some courts have found that it does if they held "confidential" positions or their conduct is the subject of the litigation in question. *See id.* at 253; *Amarin Plastics, Inc. v. Maryland Cup Corp.*, 116 F.R.D. 36, 40 (D.Mass.1987). There has been no showing here regarding the status or conduct of the former employees contacted *ex parte* by counsel.

■ It clearly appears, however, that at least some of the individuals contacted *ex parte* by Mr. Morrison are "parties" within the meaning of Rule 4.2. Even under the "control group" test, deans, trustees, department chairmen and a provost would be encompassed within the prohibition. It follows that Mr. Morrison's conduct was not appropriate. Counsel's assertion that these *ex parte* contacts were not pursued to gain discovery is belied by his efforts to secure affidavits in support of his case from the individuals interviewed. Counsel's methods in the case belie the applicability of, and cast doubt generally upon the wisdom of the rationale most often offered for such *ex parte* contacts, that is, the need to search for truth in an unfettered atmosphere.

### III.

In determining the proper sanction or remedy, the court must consider the client's right to be represented by the counsel of his choice, as well as the opposing party's right to prepare and try its case without prejudice. *See Plunto v. Wallenstein*, No. 84–1854, 1986 WL 15007 (E.D.Pa. Dec. 31, 1986). Here, one of the persons contacted, Dr. Lavker, was led to believe that counsel for parties adverse to his employer was in fact representing his interests to the point where he became uncooperative with the attorneys for the employer-plaintiff. There is not sufficient evidence, however, to conclude that plaintiff has been so severely prejudiced that the "draconian" measure of disqualification of counsel is required at this time. *See W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir.1976).

Nevertheless, the court is satisfied that the circumstances warrant precluding the defendants from introducing any information obtained through Mr. Morrison's *ex parte* contacts with persons whose statements could bind the University.

Defense counsel suggests that no action should be taken here since the law guiding ethical conduct in this area is unsettled and varies among jurisdictions. He asks the court to reject the opinion in *Cagguila, supra*, and cites two criminal cases commenting on the suppression of evidence in cases of ethical misconduct. *See United States v. Hammad*, 858 F.2d 834, 842 (2d Cir.1988), and *United States v. Buda*, 718 F.Supp. 1094, 1096–97 (W.D.N.Y.1989). In so doing, counsel may misconceive the basis for the court's concern.

While it would be inequitable to permit defendants to profit from improperly obtained information, there is another key issue here. The issue is not whether counsel incorrectly interpreted unsettled law, but whether he displayed an inappropriate disregard for the unsettled nature of that law, as well as an adverse opinion issued in this district prior to his initiation of *ex parte* contacts. Counsel, a member of the Bar of the State of New York, presumably also was aware of that state's rejection of

his interpretation of Rule 4.2. *See Niesig v. Team I*, 149 A.D.2d 94, 545 N.Y.S.2d 153 (1989). As Judge Van Antwerpen aptly stated in *Cagguila*, "In such an uncertain area of ethical conduct, we believe that a prudent attorney would have given notice to opposing counsel of the intent to take such a statement." *Cagguila*, 127 F.R.D. at 654.

There is a difference between doing something one believes to be proper and later learns is not when a court rules on a previously unsettled point, as in *Hammad*, and doing something the propriety of which one knows is in doubt. Rather than informing opposing counsel of his intent to talk with University employees or seeking leave of court to do so, Mr. Morrison imprudently proceeded with the interviews unilaterally without regard for the potential legal and ethical ramifications. *See Morrison v. Brandeis University*, 125 F.R.D. 14, 18 n. 1 (D.Mass.1989); *Cagguila*, 127 F.R.D. at 654; *Niesig, supra*. That defense counsel continued on this course after promising to desist when opposing counsel strenuously objected is in itself quite inappropriate and belies any claim of good faith mistake.

Lastly, plaintiffs request that the court order the production of any statement obtained in the course of Mr. Morrison's *ex parte* contacts. This type of equitable relief has been ordered where, as here, a party circumvents discovery procedures in order to gain an unfair advantage in litigation. *See Cagguila v. Wyeth Laboratories, supra; Haffer v. Temple University*, 115 F.R.D. 506 (E.D.Pa.1987). A court has authority to prohibit or remedy litigation practices which raise ethical concerns or may constitute ethical violations. *Chancellor v. Boeing Co., supra*, at 253; *Amarin Plastics, Inc. v. Maryland Cup Corp., supra*, at 39. *See also Roadway Express v. Piper*, 447 U.S. 752, 765, 100 S.Ct. 2455, 2463–64, 65 L.Ed.2d 488 (1980). The court concludes that this is an appropriate remedial measure in this case. Moreover, defendants' resistance to this request is hard to reconcile with the assertion in their brief in opposition to plaintiff's motion for dis-

qualification of counsel that they were in fact "supplying" to plaintiff's counsel "the evidence we have found." (Dfdt.Br. at 23).

An appropriate order will be entered.

ORDER

AND NOW, this 7th day of May, 1990, upon consideration of plaintiff's Motion to Disqualify and the defendants' response thereto, and following an opportunity for hearing and argument thereon, IT IS HEREBY ORDERED that said Motion is GRANTED IN PART and DENIED IN PART, as follows:

(1) Thomas C. Morrison, Esquire, will not be disqualified from representing defendants in this action;

(2) Defendants will be precluded from using information obtained during *ex parte* contacts with persons affiliated with plaintiff (a) as officers, directors or managers; (b) whose acts or omissions could bind or impute liability to plaintiff; (c) whose statements could be used as admissions litigation; including Drs. Aiken, Kelley, Lavker, Lazarus and Stemmler, and Mr. Miller; and

(3) Defendants are directed to produce any statements or exhibits obtained through such *ex parte* contacts within ten (10) days.

IT IS FURTHER ORDERED that defendants' "Cross–Motion to Restrain" plaintiff from interfering with defendants' pursuit of *ex parte* contacts is DENIED.