John D. SHADE, Plaintiff,

v.

**GREAT LAKES DREDGE & DOCK COMPANY, Defendant.**

No. Civ.A. 97–739.

United States District Court, E.D. Pennsylvania.

Nov. 16, 1999.

Marvin I. Barish, Philadelphia, PA, for plaintiff.

Michael G. Sabo, Robert B. White, Jr., Philadelphia, PA, for defendant.

### MEMORANDUM & ORDER

KATZ, Senior District Judge.

Before the court is defendant's motion to disqualify attorney Marvin I. Barish from continuing to represent plaintiff John Shade. Because disqualification is an in-

1. The applicable ethical precepts in this district are the Rules of Professional Conduct. *See* Local Rule 83.6, IV.

2. Defendant also argues that Barish has committed professional misconduct in a third way by violating or attempting to violate the rules

appropriate sanction under these circumstances, the court will deny the motion.

### I. Background

John Shade brought this action under the Jones Act for injuries he suffered during his employment with defendant. After a jury trial in October 1997, plaintiff was awarded $870,000. The Third Circuit reversed this judgment for evidentiary error, and the case is scheduled for retrial beginning on December 13, 1999.

Defendant's present motion argues that Barish must be disqualified for violations of two professional rules.[1] Defendant first argues that the acknowledged provision of an apartment and associated costs for Shade and his family by the Barish firm since November 1997 qualifies as a conflict of interest that warrants disqualification. Defendant also claims that Barish knowingly offered false testimony to the court during the 1997 trial and that this requires his disqualification.[2]

### II. Standards

A district court has power to disqualify an attorney deriving "from its inherent authority to supervise the professional conduct of attorneys appearing before it." *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980); *see also In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir.1984) (same). As many decisions have stressed, "courts have vital interests in protecting the integrity of their judgments, maintaining public confidence in the integrity of the bar, eliminating conflicts of interest, and protecting confidential communications between attorneys and their clients." *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1203 (E.D.Pa.1992); *see also United States v.*

of professional conduct. *See* Rule of Professional Conduct 8.4. However, as this claim is completely derivative of the other two arguments, the court will not consider it as an independent basis for disqualification.

*Moscony,* 927 F.2d 742, 749 (3d Cir. 1991) (same).

In this case, the general power of the court to sanction an attorney is not at issue. The only question is whether the extreme sanction of disqualification is appropriate assuming that an ethical rule was violated. While disqualification is obviously a permissible and even necessary step in some cases, disqualification should not be imposed lightly.

> [T]he court should disqualify an attorney only when it determines, on the facts of the particular case, that disqualification is an appropriate means of enforcing the applicable disciplinary rule. It should consider the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restriction.

*Miller,* 624 F.2d at 1201. That is, even if the court finds that an attorney violated an ethical rule, "disqualification is never automatic." *Id.; see also Cohen v. Oasin,* 844 F.Supp. 1065, 1067 (E.D.Pa.1994) (stating that district court has latitude to impose sanctions in a manner fair to all parties to the litigation). Although this right is obviously not absolute, a party's choice of counsel is a significant consideration in determining the propriety of disqualification. *See Commonwealth Ins.,* 808 F.Supp. at 1203. Weighing against this right is the need to protect opposing parties' ability to try their case in a fair manner. *See, e.g., University Patents, Inc. v. Kligman,* 737 F.Supp. 325, 329 (E.D.Pa.1990).

Doubts should be resolved in favor of disqualification, *see Brennan v. Independence Blue Cross,* 949 F.Supp. 305, 307 (E.D.Pa.1996), but it is the burden of the party arguing for disqualification to demonstrate clearly that "continuing representation would be impermissible." *Id.* (quoting *Cohen,* 844 F.Supp. at 1067). As a general rule, motions to disqualify opposing counsel are disfavored. *See Cohen,*

844 F.Supp. at 1067; *Kligman,* 737 F.Supp. at 329. While the court does not suggest that the present motion was filed for strategic purposes, it must be acknowledged that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." Rules of Professional Conduct, Preamble Scope.

## II. The Alleged Violations

### A. Living Expenses

The basis for defendant's first allegation of impropriety is the Barish firm's provision of an apartment and related expenses to the Shade family. *See* Def. Ex. A (deposition testimony of Shade stating that Barish paid rent and other expenses since 1997); Def. Ex. B (rental papers listing Barish as applicant for occupancy by Shade and his family; billing records of apartment indicating Barish paid rent). Barish does not dispute these facts, although he explains that his firm had acquired the apartment to house out-of-town clients and experts. *See* Pl.Mem. of Law at 1. According to Barish, the Shades' occupancy began after Shade lost both his job and his home following the first trial and was extended indefinitely after Shade's wife was injured and he had an "emotional breakdown." *Id.* The family was told from the outset that they had no obligation to repay rent or other expenses. *See* Pl.Ex. A. Before taking this step, the Barish firm consulted with outside counsel, which opined that the firm would not violate applicable ethical rules if it provided housing and related expenses to the Shades. *See* Pl.Ex. B.

Defendant, however, argues that this conduct violated Rule 1.8, which generally prohibits lawyers from engaging in representation that constitutes a conflict of interest, and that Barish must be disqualified. As is most relevant in this case, the rule states:

> (e) A lawyer shall not provide financial assistance to a client in connection with

pending or contemplated litigation, except that:

    (1) a lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter; and

    (2) a lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.

  . . . .

(j) A lawyer shall not acquire a proprietary interest in a cause of action that the lawyer is conducting for a client, except that the lawyer may:

    (1) acquire a lien granted by law to secure the lawyer's fee or expenses; and

    (2) contract with a client for a reasonable contingent fee in a civil case.

Rule of Professional Conduct 1.8. As the commentary to the rule suggests, subsection (j) "has its basis in common law champerty and maintenance." Commentary to Rule 1.8. Section (e)'s provisions for payment of some expenses are a specific exception to those principles. *See id.*

The traditional perspective suggests at least three harms that could result from permitting lawyers to provide living expenses to their clients: (1) loaning money to a client gives the lawyer an interest in the litigation that could cause the lawyer to act other than in the client's best interests; (2) permitting such advances might encourage attorneys to seek out marginal claims that would "churn[ ] up litigation"; and (3) permitting advances might degrade the profession by leading lawyers to compete for clients by offering the best financial assistance packages. Michael R. Koval, "Living Expenses, Litigation Expenses, and Lending Money to Clients," 7

Geo. J. Legal Ethics 1117, 1117–18 (1994). The modern perspective frames these evils primarily in terms of a prohibited conflict of interest between the attorney and the client. *See, e.g.,* Dawn S. Garrett, "Lending a Helping Hand: Professional Responsibility and Attorney–Client Financing Prohibitions," 16 U. Dayton L.Rev. 221, 230–35 (1990) (analyzing prohibition within framework of ethical canons). These concerns are evidenced in the 1954 American Bar Association Opinion on this issue submitted by defendant. *See* Def. Ex. 1. In that opinion, the ABA stated that payment of living expenses was improper as it gave the attorney an interest in the outcome of the litigation because, presumably, the living costs advanced would be reimbursed from the verdict. This situation might lead the attorney to consider her own interests above those of the client in negotiating a settlement.[3]

Both parties, understandably, spend a considerable amount of time arguing as to whether or not there was a violation of an ethical rule. It is unnecessary to rule on this question however. Even assuming that the provision of an apartment and related expenses violates the Rules of Professional Conduct, disqualification is not necessary to effectuate the purposes of the rule or protect the integrity of the legal process in this case. First, the client's interests would not be served by disqualification. Barish has represented Shade in this matter for more than two years and is preparing for a trial scheduled in less than a month. Obviously, this point is not dispositive, and, were the court convinced that there was risk of a genuine conflict between Shade and his attorney, the matter would be resolved differently. However, the fact that Shade will not be asked to repay the firm for costs of housing his

---

**3.** To some degree, the present prohibition on an attorney's provision of non-litigation expenses is a divergence from the common law. Prior to the 1954 ABA Opinion, "most courts favored allowing attorneys to loan funds to their clients for living expenses." Garrett, 16 U. Dayton L.Rev. at 225. Although the ma-

jority of jurisdictions still prohibit advancement of all non-litigation expenses, several states have recently modified this practice. *See* Koval, 7 Geo. J. Legal Ethics at 1136–37; Garrett, 16 U. Dayton L.Rev. at 247–48; *see also* Pl.Mem. of Law at 12 n. 24 (listing jurisdictions that have adjusted ethical rules).

family indicates that the risk of improper settlement to protect the law firm's interest is low.[4] *See, e.g. Essex County Jail Annex Inmates v. Treffinger,* 18 F.Supp.2d 418, 431–32 (D.N.J.1998) (in discussing Rule 1.7, noting particular need to have specific finding of conflict in situations in which attorneys' interests may trump those of clients; rejecting applicability of multi-defendant conflict cases to attorney self-interest cases). Second, while the court acknowledges the significant public interest in untainted legal proceedings and in promoting attorney integrity, permitting Barish to continue representing Shade will not compromise these principles. The defendant argues for disqualification based solely on its expressed concern for the legal system and for Shade but does not suggest that its own ability to prepare for trial or present its case will be hampered. Nor does the court envision any public interest that would outweigh Shade's interest in continuing to work with Barish; in fact, the danger of public dissatisfaction with the legal process appears to be greater from the last minute disqualification of an attorney who apparently provided housing for a client who was faced with dire financial circumstances.

Counsel has not submitted any precedent suggesting that disqualification in an ongoing case is an appropriate response to the payment of living expenses. The only case defendant cites on this issue is *In re Berlant,* 458 Pa. 439, 328 A.2d 471 (1974). In that case, an attorney appealed from a decision suspending him from practice for five years because of fifteen instances of misconduct, including two counts of improper advances to clients. *See id.* at 473.

The majority opinion discussed the improper advances only in a footnote, in which the court stated that the attorney attempted "to justify his advances on the basis of the client's indigency[.]" While the court ruled motivation irrelevant to a finding that the attorney had committed an offense, the court stated that motivation was relevant in considering the appropriate sanction. *See id.* at 476 n. 12. Furthermore, a concurring and dissenting opinion suggested that the propriety of sanctions would be doubtful if the attorney had advanced money solely for humanitarian reasons. That opinion explained, "My concurrence on [the advancement] charge is based *solely* on the evidence indicating that the purpose of one 'loan' was not simply to enable an indigent client to withstand the rigors of a possibly protracted litigation, but was designed to (and did) influence the client—who had already retained other counsel—to dismiss his attorney and retain appellant." *Id.* at 479 (Manderino, J., concurring and dissenting).

*Berlant* is thus of limited value in determining the proper course of action in this case because of the larger number of allegations of misconduct and the scant discussion of the issue of providing living expenses. If anything, *Berlant* furthers the plaintiff's position by suggesting that the court should consider the attorney's motivation in advancing monies when determining what, if any, sanctions to impose. The only other authority directly on point submitted by defendant is the 1954 American Bar Association Opinion. The ABA Opinion did not, however, indicate that disqualification was necessarily the proper response to a violation of the rule.[5]

4. While there is admittedly a converse risk that the provision of housing without requiring repayment could lead to the unacceptable practice of attorneys competing for clients by offering financial incentives, defendant offers no proof that the Barish firm acts in this manner regularly or that this hypothetical possibility requires disqualification in this case.

5. Although plaintiff asserts that courts have "uniformly" declared that provision of living expenses for humanitarian reasons does not constitute a violation of Rule 1.8, there are decisions in which various disciplinary boards have imposed sanctions. Most of the cases imposing significant penalties addressed attorneys who had violated many ethical precepts over a long period of time. *See, e.g., In the Matter of Carroll,* 124 Ariz. 80, 602 P.2d 461 (1979) (suspending attorney for one

## B. Offering False Testimony

■ Defendant next alleges that Barish knowingly presented false testimony by Mark Oldham, a witness at Shade's trial, and that this warrants disqualification. Mark Oldham was one of John Shade's co-workers at Great Lakes Dredge. In 1995, Barish represented Oldham in his own personal injury action. During Oldman's trial in the New Jersey District Court in April 1995, Barish elicited testimony from Oldham in which he stated that he was running the front end loader that injured Shade's hand. In the course of that testi-mony, Oldham explained that he cut off Shade's thumb when he pulled the wrong lever on the machine. *See* Def. Ex. C at 60–61 (testimony at Oldman's trial).[6] Mr Barish referred to that explanation in his closing in the same trial. *See* Def. Ex. D at 15.[7] In contrast, at Shade's trial, Oldham testified that the lever had fallen down accidentally and that he had nothing to do with the accident in which Shade lost his thumb. He explained that he was not even in the cab of the machine when the accident occurred. *See* Def. Ex. F at 37 (direct and cross-examination).[8] Defen-

year because of extensive solicitation of business, use of improper contingency fee agreements that relieved clients of obligation to repay advances if suit was unsuccessful, and cash advances unrelated to litigation). In contrast, attorneys found only to have improperly paid expenses frequently receive relatively minor sanctions. *See, e.g., Oklahoma v. Smolen,* 837 P.2d 894 (Okla.1992) (issuing public reprimand to attorney who advanced living expenses to destitute clients but containing concurring and dissenting opinions suggesting that rule's prohibition may violate due process and impose an unreasonable burden on poor litigants); *Attorney Grievance Comm'n of Maryland v. Kandel,* 317 Md. 274, 563 A.2d 387 (1989) (issuing public reprimand to attorney who advanced living expenses); *see also* "Validity and Propriety of Arrangement by which Attorney Pays or Advances Expenses of Clients," 8 A.L.R.3d 1155 § 7 (1967 & 1998 Supp.) (stating the issue of whether paying or advancing expenses warrants disciplinary action "has been presented in comparatively few cases and then usually not in such a way as to isolate the issue whether such misconduct, standing alone, was cause for disbarment, suspension from practice, or reprimand. In most of the cases where disciplinary action was approved, the payment or advancement of expenses has been only one fact in a general picture showing improper solicitation of legal business or other misconduct."). As noted previously, the court acknowledges that a growing number of jurisdictions are relaxing the prohibition on providing such assistance.

6. The relevant exchange between Barish and Oldham is as follows:

Q. And while you were operating that front end loader, could you tell us what occurred and why it occurred?

A. Me, myself and John Shade went down to get an air and gas bottle, and I was dropping down the forks. They have two forks and two prongs on the top of the forks that grab the pipe, and I was lowering down not the prong—not the—the forklift itself, and he was going to hook the gas onto it, and I pulled the lever. I thought I pulled the right lever, and somehow the prongs came down, and I cut the man's thumb off.

. . .

Q. Why did the lever come down?

A. I pulled the wrong lever.

The Court: Do you know how you happened to pull the wrong one?

The Witness: I reached over, your Honor, and I pulled what I thought was the right lever.

Def.Ex. C at 61.

7. Barish's closing stated:

He went back to work, slipped, broke his ankle on the grease, because he couldn't see the grease with his eye.

Went down there, and actually because he pulled the wrong lever because he couldn't see it, amputated the thumb of one of his fellow workers, and at that point he didn't give up.

Def.Ex. D at 15.

8. On direct examination, Barish asked:

Q. Now, did you operate the control of the claw at any time in this procedure?

A. No.

Def.Ex. F at 37. On cross-examination, defense counsel asked:

Q. And you did not hit a control or lever at anytime to bring those punchers down, is that correct?

A. That's correct.

Q. Now, Mr. Oldham—So it is your testimony that these pinchers fell by themselves somehow?

A. That's what I'm saying.

dant stresses that Barish met with Oldham numerous times, both in the preparation of his own case and in connection with his testimony for Shade's case. During at least one deposition, Oldham also explained that he did not cause the accident in which Shade lost his thumb. *See* Def. Ex. E at 99–100, 106–07 (Oldham dep.).[9]

■ Defendant alleges that this testimony violated Rule 3.3, which describes an attorney's duty of candor toward a tribunal. That rule states in relevant part:.

   (a) A lawyer shall not knowingly:

     (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

   . . .

   (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

Rule of Professional Conduct 3.3. This rule safeguards principles that are basic to the adversarial system of justice: The excesses of this system would likely overcome its virtues if attorneys were free to represent clients with no regard whatsoever for the truth of their statements to the court. *See Eagan by Keith v. Jackson,* 855 F.Supp. 765, 790–91 (E.D.Pa.1994); *see also United States v. Shaffer Equip.,* 11 F.3d 450, 457 (4th Cir.1993) ("Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process."). That is, the overall duty of truth "takes it shape from the larger object of preserving the integrity of the judicial system." *Id.* However, it is important to emphasize that a mere suspicion of perjury is not enough to require disclosure to the court. *See id.* at

459. As the rule quoted above indicates, an attorney's duty to inform the court does not arise unless the attorney *knows* that false testimony has been elicited; an attorney has the option of refusing to offer testimony she *believes* to be false.

The defendant has not met its burden of justifying disqualification under this rule. First, the court is not satisfied that defendant has shown that Barish offered false testimony, much less that he did so knowingly. According to Oldham's affidavit, his testimony at his own trial was based on the knowledge he had at the time. *See* Pl.Ex. E ¶ 9 (Aff. by Oldham). He explains that his limited experience on the machine that caused the injury led him to believe mistakenly that "the lowering of the claws could only have occurred by pulling the lever for the claws," *id.* ¶ 4, when, in fact, he later learned that the machine itself had mechanical problems that "affected the movement of the claws." *Id.* ¶ 5. Oldham also states, "I further became aware that even if I had pulled the wrong lever in an effort to raise the forks, that would not have caused the claws to fall." *Id.* ¶ 5. The supporting memorandum of law explains that Oldham's testimony at his trial on this matter was peripheral evidence "offered with other evidence to explain Mr. Oldham's own subjective belief that he was unable to return to seaman's duties as his eye injury prevented him from properly performing his work." Pl. Mem. of Law at 16.

More importantly, the court does not believe that disqualification is the only means to enforce the rule in general or, in this case, to assure that trial occurs without taint of wrongdoing or unfairness to the defendant. Knowledge of the seeming

---

*Id.* at 102–03.

**9.** At one point, Oldham stated, "At the time of the accident, I was out of the cab, coming out of the cab." Def. Ex. E at 106. Later, this exchange occurred upon questioning from defense counsel:

   Q. Did you operate the control for the claw at any time in this operation?

   A. No, I didn't.

   Q. So, the claw came down without any—

   A. Any warning.

   Q.—without any warning and without you touching any lever; is that correct?

   A. That's correct.

*Id.* at 114.

inconsistency in Oldham's testimony provides the defendant with ample ground to impeach him and to raise the question of what, if any, role Barish played in the different testimony. *See Essex County Jail Annex Inmates,* 18 F.Supp.2d at 440 (focusing primarily on degree to which misconduct tainted future proceedings). That is, the defendant does not face meaningful prejudice either in terms of trial preparation or trial presentation. Similarly, the public's interests in a fair and open resolution of this dispute will be served by exploration of these issues in the courtroom itself during trial. Weighing strongly against disqualification, as described previously, are the rapidity with which trial is approaching and Barish's long-time representation of Shade. These factors warrant permitting Barish to continue acting as Shade's attorney. *Cf. id.* at 443–45 (holding that attorney who disclosed sensitive information regarding security to inmates and then misled court had to be disqualified because of potential prejudice to enforcement of consent decrees).[10]

III.  Conclusion

In denying defendant's motion, the court makes no comment on the propriety of sanctions besides disqualification. The only question before this court is whether Barish should be disqualified from representing Shade in the outgoing litigation regarding his injury. With this in mind, the court looks to the degree to which Barish's actions compromise his client and the degree to which they would taint the trial scheduled for December. Shade would suffer severe hardship from losing the attorney he has selected at this late point in the process, and both of the allegations made by defendant may be explored in the trial itself, a fact that lessens the possibility of public disenchantment with the judicial process and the bar. The public discussion of these issues will also ensure that the defendant is not hampered in presenting its own position. In short, the defendant has not met its burden of demonstrating that disqualification is necessary.

An appropriate order follows.

### *ORDER*

**AND NOW,** this 16th day of November, 1999, upon consideration of Defendant's Motion for Disqualification of Plaintiff's Attorney, Marvin I. Barish, and the response thereto, it is hereby **ORDERED** that the Motion is **DENIED.**

---

**10.**  The court cannot help but notice the lack of precedent supporting disqualification on either this point or the living expenses charges. Two of the cases cited by defendant, *In re Eastern Sugar Antitrust Litigation,* 697 F.2d 524 (3d Cir.1982), and *IBM Corporation v. Levin,* 579 F.2d 271 (3d Cir.1978), address very different facts, and the latter simply supports the uncontroversial proposition that if a court finds an attorney to have violated an ethical rule, it may be error for the district court to fail to take appropriate action, including disqualification in some circumstances. The other cases cited by defendant in which attorneys were disqualified arise in such different factual circumstances that they are of limited applicability. The first case, *ILA, Local Union 1332 v. ILA,* 909 F.Supp. 287 (E.D.Pa.1995), addressed a variety of conflicts, many of which stemmed from defense counsel's representation of plaintiff's Local Union; one of the conflicts at issue was a defense firm's *current* representation of plaintiff in a suit. These conflicts were both numerous and direct such that the only possible remedy was disqualification. *See id.* at 293. Similarly, the plaintiff's attorney in *Slater v. Rimar, Inc.,* 462 Pa. 138, 338 A.2d 584 (1975), was disqualified because he had previously represented the defendant and was believed to have divulged confidences to his current client. *See id.* at 585–86. Finally, in *Pirillo v. Takiff,* 462 Pa. 511, 341 A.2d 896 (1975), an attorney was disqualified from representing before a grand jury twelve police officers who were accused of taking bribes because of the danger of interfering with each individual's right of effective representation and because the Fraternal Order of Police, which paid the attorney, had a policy of opposing cooperation by individual police officers with the prosecutors' office. *See id.* at 899.