Julian RUBIO, Jr., Plaintiff,

v.

BNSF RAILWAY COMPANY,
Defendant.

No. CV 07–0339 BB/WPL.

United States District Court,
D. New Mexico.

March 11, 2008.

Brian P. Brack, Branch Law Firm,
Richard A Sandoval, Branch Law Firm,
Albuquerque, NM, for Plaintiff.

Harry Jesse Jacobus, III, Tim L. Fields,
Modrall Sperling Roehl Harris & Sisk PA,
Albuquerque, NM, for Defendant.

**ORDER**

WILLIAM P. LYNCH, United States
Magistrate Judge.

On April 9, 2007, Julian Rubio, Jr., filed
this action for violations of the Federal
Employers' Liability Act and the Safety
Appliance Act against his former employ-

er, BNSF Railway Company. (Doc. 1, 12, 23.) On July 31, 2007, Mr. Rubio's local counsel filed a motion for admission *pro hac vice* on behalf of R.L. Pete McKinney and Patrice McKinney, who are licensed to practice law in Texas. The motion stated that the McKinneys had been provided "the New Mexico Rules of Court." (Doc. 13.) I granted the motion without objection from BNSF. (Doc. 14.)

It is now undisputed that before this suit was filed, Mr. Rubio and the McKinneys jointly borrowed $86,400 from a Texas bank to subsidize Mr. Rubio's living expenses. Because this transaction violates the New Mexico Rules of Professional Conduct, BNSF has filed a motion to revoke the McKinneys' *pro hac vice* admission. (Doc. 39.) This order will grant the motion.

### BNSF's Motion

In its motion, BNSF indicates that it first learned of the McKinneys' financial assistance to Mr. Rubio during his deposition on November 30, 2007. The following colloquy occurred between BNSF's attorney and Mr. Rubio:

Q: Okay. And are you—do you and your wife have any outside businesses or money-making enterprises?

A: No, sir.

Q: Right now, what income are you receiving? What money is coming into your household?

A: My disability, and my attorney helps me out now and then when I get in a jam.

Q: All right. In terms of your disability, how much do you make per month?

A: 3,000 something.

Q: Okay. A little over 3,000?

A: Yes, sir.

Q: And then you said your attorney helps you out on occasion?

A: Uh-huh.

Q: Do you have any idea—are you keeping track how much money he's helped you out with?

A: No, sir.

Q: Do you ever get a statement asking him how much you owe him?

A: No, sir.

Q: Do you understand you have to pay that back?

A: Yes, sir.

Q: And you have no idea, as we sit here, how much money you have to pay back?

A: No, sir.

Q: Do you have any other source of income other than the disability and your attorney?

A: No, sir.

(*Id.* Ex. C.)

A December 10, 2007 letter from a BNSF attorney to Mr. McKinney states, "Today you stated during our telephonic conversation that the financial assistance referenced by your client [during his deposition] consisted of you cosigning a loan for[ ] Mr. Rubio." (*Id.* Ex. D.) Counsel advised Mr. McKinney that this financial assistance appeared to violate the New Mexico Rules of Professional Conduct and requested that Mr. Rubio supplement his responses to certain discovery requests "by providing all documentation memorializing and/or otherwise documenting the financial assistance you provided to Mr. Rubio." (*Id.*)

Mr. McKinney responded to the letter in writing on December 21, 2007. (*Id.* Ex. E.) He stated that the loan funds were sent directly to Mr. Rubio by the bank and that the principal balance due on the loan

at that time was $81,600. Without conceding that they were responsive to any discovery request, Mr. McKinney enclosed copies of a note and renewal documents that were signed by Mr. Rubio and the McKinneys. The documents reflect that the initial loan amount was $43,200 on January 17, 2006, and that this amount was increased to $86,400 on November 9, 2006, after the initial $43,200 had already been disbursed. Mr. Rubio and the McKinneys jointly and severally promised to repay the loan on January 17, 2008. The loan's "specific purpose" was "Client Expenses." (*Id.*) Although BNSF's attorney requested all documentation regarding the financial assistance that the McKinneys provided Mr. Rubio, no other information was provided.

### The McKinneys' Response

In their response to BNSF's motion, the McKinneys do not dispute the facts regarding the loan as set forth in the motion and exhibits. The response was filed the day after the due date of the loan, but the McKinneys do not assert that the loan has been repaid, nor do they dispute Mr. Rubio's acknowledgement in his deposition that he must repay the money to the McKinneys.

The McKinneys explain that the loan was made before the original filing of this suit in a Tarrant County, Texas, state court. Shortly after the filing of the complaint in this Court, the Tarrant County case was nonsuited. Because Texas does not prohibit lawyers from advancing reasonably necessary medical and living expenses, the McKinneys assert that the loan was valid and ethical when and where it was made and that the loan remains valid in New Mexico under New Mexico's choice of law rules.

The McKinneys claim that they did not intentionally violate the New Mexico Rules of Professional Conduct. They assert that New Mexico's prohibition on financial assistance "is, quite frankly, surprising to a Texas lawyer." (Doc. 41 at 6.) According to the McKinneys, local counsel only provided them with a copy of this Court's local rules. They suggest that they could not have known that the loan violated the New Mexico Rules of Professional Conduct without "undertak[ing] a detailed study of the New Mexico rules, most of which are substantially the same as the Texas rules." (*Id.*)

The McKinneys profess to have "considerable expertise in FELA litigation." (*Id.*) Because of their expertise and the time and effort they have already devoted to this case, they contend that their disqualification would prejudice Mr. Rubio more than any possible benefit to BNSF.

### LEGAL STANDARDS

██ This Court has discretion to disqualify an attorney who has committed an ethical violation. *Cole v. Ruidoso Mun. Sch.,* 43 F.3d 1373, 1383 (10th Cir.1994); *Biocore Med. Techs., Inc. v. Khosrowshahi,* 181 F.R.D. 660, 664 (D.Kan.1998); *see also Hutchinson v. Pfeil,* 105 F.3d 562, 565 (10th Cir.1997) (holding that disqualification is a nondispositive matter that may be ordered by a magistrate judge). The moving party bears the burden of establishing that disqualification is warranted. *See Biocore,* 181 F.R.D. at 664.

██ The Tenth Circuit has held that motions to disqualify are governed by two sources of authority. *Cole,* 43 F.3d at 1383. First, attorneys are bound by the local rules of the court in which they appear. *Id.* In this Court, the New Mexico Rules of Professional Conduct apply. *See* D.N.M.LR-Civ. 83.9. Second, because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, standards developed under federal law also apply.

*Cole,* 43 F.3d at 1383 (citing *In re American Airlines, Inc.,* 972 F.2d 605, 610 (5th Cir.1992)). "Therefore, motions to disqualify are governed by the ethical rules announced by the national profession and considered in light of the public interest and the litigants' rights." *Id.* (citation and internal quotation marks omitted).

Although the Tenth Circuit has not spoken on this issue, some courts—including courts in this circuit—have held that disqualification should not be ordered unless the unethical conduct "taints" the lawsuit or the legal system. *See, e.g., W.T. Grant Co. v. Haines,* 531 F.2d 671, 677 (2d Cir. 1976); *Biocore,* 181 F.R.D. at 664; *Fed. Deposit Ins. Corp. v. Isham,* 782 F.Supp. 524, 528 (D.Colo.1992); *see also United Nuclear Corp. v. Gen. Atomic Co.,* 96 N.M. 155, 629 P.2d 231, 322 (1980) (citing *W.T. Grant v. Haines* and declining "to reverse a judgment that is not tainted by the . . . firm's conflict"). The Fifth Circuit has rejected the "taint standard" in favor of a standard that requires a court to take measures against unethical conduct occurring in connection with any proceeding before it. *See In re American Airlines,* 972 F.2d 605, 610–11 (5th Cir.1992); *see*

*also Cole,* 43 F.3d at 1383 (favorably citing *American Airlines* for the related proposition that federal standards should control). The court stated:

> We recognize of course that disqualification motions may be used as "procedural weapons" to advance purely tactical purposes. But we do not believe that a priori assumptions concerning the motivations underlying disqualification motions in general justify a more relaxed ethical rule. Our prior cases disclose that a careful and exacting application of the rules in each case will separate proper and improper disqualification motions.

*American Airlines,* 972 F.2d at 611.[1] Even in the Second Circuit, where the taint standard originated, the standard is met when an attorney's conflict of interest "undermines the court's confidence in the vigor of the attorney's representation of his client." *Bd. of Educ. of City of N.Y. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979).

▮ I conclude that disqualification should be ordered if it will serve the purposes behind the ethical rule in question. *Biocore,* 181 F.R.D. at 664. This requires

---

1. The Fifth Circuit also found the assumptions underlying the taint standard to be "questionable." First, the "taint" standard rests on a belief that ethical conflicts surfacing during a litigation are generally better addressed by the comprehensive disciplinary machinery of the state and federal bar. It is not clear that the vitality of state enforcement is relevant to the judicial duty of the federal courts to clean its own house. Policy aside, it is equally uncertain that the disciplinary boards have performed this role. Clients and fellow attorneys have little incentive to file formal complaints with disciplinary boards, and the evidence suggests that they in fact do not. This is especially true in cases of alleged conflicts of interest. To a very large extent, unless a conflict is addressed by courts upon a motion for disqualification, it may not be addressed at all. More to the point, it is our business— our responsibility.

Second, we believe that today there is less reason to suspect tactical motivations behind disqualification motions than at the time the "taint" standard was initially formulated in the 1970s. This is not due to any moral transformation of the bar, but to the relative absence of tactical advantages that might be secured by disqualification orders under today's law. At that time, disqualification orders were immediately appealable; the greatest tactical advantage offered by these motions was delay, as the trial proceedings were halted while the motion went up on appeal. Under the *Firestone* regime, however, disqualification motions are not appealable prior to final judgment, thus severely limiting any advantages a party might have achieved through delay.

*American Airlines,* 972 F.2d at 611 (internal citations and quotation marks omitted).

balancing society's interest in ethical conduct, litigants' right to choose their counsel, and the hardship that disqualification would impose on the parties and the entire judicial process. *Id.* Doubts should be resolved in favor of disqualification because the interests to be protected are critical to the judicial system. *Id.*

This matter has been fully briefed by both sides, neither side has requested a hearing, and the facts supporting disqualification are undisputed. Therefore, I find it unnecessary to conduct an evidentiary hearing. *See Weeks v. Indep. Sch. Dist. No. I–89,* 230 F.3d 1201, 1212 (10th Cir. 2000).

## DISCUSSION

BNSF asserts that the McKinneys have violated Rule 16–108, subdivisions (E) and (J), of the New Mexico Rules of Professional Conduct. Rule 16–108(E) states, "A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that" a lawyer may pay court costs and expenses of litigation if the client is indigent, or if not indigent the client remains ultimately liable for the costs and expenses. Rule 16–108(J) states, "A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation," except that the lawyer may contract for a reasonable contingent fee and may acquire a lien granted by law to secure the lawyer's fee or expenses. Rule 16–108 is based on the American Bar Association Model Rules of Professional Conduct and the subdivisions of the rule cited by BNSF do not differ from the model rule in any respect material to this case. *See* MODEL RULES OF PROF'L CONDUCT R. 1.8(e) (2002).

### *Financial Assistance*

Rule 16–108(E) prohibits lawyers from subsidizing lawsuits by directly giving or lending money to a client or by guaranteeing third-party loans to the client. MODEL RULES OF PROF'L CONDUCT R. 1.8(e) cmt. (2002). There is no doubt that the McKinneys have violated this rule. They admit that they co-signed for the loan and that the money was sent directly to Mr. Rubio.

The purpose of Rule 16–108(E) is to avoid giving the lawyer too great a financial stake in the litigation, to deter clients from pursuing litigation that might not otherwise be brought, *id.,* and "to ensure against conflicts of interest between lawyers and their clients," *Trambley v. Wyman,* 125 N.M. 13, 956 P.2d 144, 146 (1998). As the New Mexico Supreme Court has noted, the relationship between a debtor and a lender is inherently adversarial in nature. *In re Darnell,* 123 N.M. 323, 940 P.2d 171, 175 (1997). Attorneys should avoid such adversarial relationships with their clients. *Id.*

The loan may have already had an adverse effect on this case. I presided over an unsuccessful settlement conference. The loan could very well have determined the negative outcome of the conference.

The McKinneys suggest that a loan to a client does not materially increase "whatever conflict [of interest] is created by permitting a contingent fee and permitting counsel to advance litigation expenses." (Doc. 41 at 4–5.) Contingent fees and the advancement of litigation expenses are exceptions to the general rule prohibiting financial assistance to clients. These practices are allowed, despite their potential to create conflicts of interest, to ensure access to the courts. *See* MODEL RULES OF PROF'L CONDUCT R. 1.8(e) cmt; *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35 cmt. b (rationale for contingent fees). The McKinneys would have the exceptions swallow the rule. *See* RESTATEMENT, *supra,* § 36 cmt. c (noting that lawyer loans to clients are regulated because they give the lawyer the conflict-

ing role of a creditor and could induce the lawyer to conduct the litigation so as to protect the lawyer's interests rather than the client's, but that this danger does not warrant prohibiting lawyers from lending a client litigation expenses because such a prohibition would prevent poor clients from asserting their rights). There is no indication in this case that a loan of over $86,400 was necessary to allow Mr. Rubio access to the courts.

The Oklahoma Supreme Court has held that the different treatment of litigation and living expenses "is rationally related to a legitimate goal of protecting clients and maintaining the integrity of the Bar." *Oklahoma ex rel. Okla. Bar Ass'n v. Smolen,* 17 P.3d 456, 463 (Okla.2000). The court reasoned:

> First, litigation expenses and court costs are directly related to the actual litigation. Living and other expenses are not. Second, litigation expenses and court costs are within a lawyer's expertise. Other expenses of clients are not considered part of a lawyer's expertise. Third, it is a lawyer's duty to advise his client on which litigation expenses and court costs are necessary for the litigation. It is not generally the lawyer's duty to advise his clients as to what other expenses are necessary. Fourth, a lawyer generally pays the litigation expenses and costs directly to the provider. In the case of other expenses, the lawyer generally would give the money to the client, and there would be no guarantee that the money would be utilized for the loan's intended purpose.

*Id.*

The McKinneys also rely on a Texas ethics rule in arguing that they should not be disqualified. Contrary to the New Mexico rule, the Texas rule allows a lawyer to advance or guarantee "reasonably necessary medical and living expenses."

Tex. Disciplinary Rules of Prof'l Conduct 1.08(d)(1).

■ The McKinneys claim that they did not intentionally violate New Mexico's rule because they did not know it differed from the Texas rule. This claim is unavailing. "[T]here is no need to find willfulness to find an ethical obligation." *Butler v. Biocore Med. Techs., Inc.,* 348 F.3d 1163, 1172 (10th Cir.2003). Ignorance of the law is likewise no defense. *See id.* at 1174. This principle has particular force in this case because the New Mexico rule is not an anomaly; rather, it is the majority rule. *See Smolen,* 17 P.3d at 460 ("Only eight states explicitly allow lawyers to advance or guarantee loans to clients for living expenses."). *But see* James E. Moliterno, *Broad Prohibition, Thin Rationale: The "Acquisition of an Interest and Financial Assistance in Litigation" Rules,* 16 Geo. J. Legal Ethics 223 (2003) (criticizing the majority rule). And as noted above, the New Mexico rule is virtually identical to the model rule promulgated by the American Bar Association. The Tenth Circuit has held that "the ABA Model Rules of Professional Conduct ... reflect the national standard to be used in ruling on disqualification motions." *Cole,* 43 F.3d at 1383.

The McKinneys also argue that strong public policy reasons support the Texas rule. They observe that "personal injury plaintiffs are sometimes destitute," that allowing lawyers to "furnish necessities" is charitable, and that a plaintiff should not be "forced to settle for far less than the objective value of the case out of an urgent need for medical care or living expenses." (Doc. 41 at 2–3.) Whatever the validity of the these observations in general, there is no evidence in this case that Mr. Rubio's "reasonably necessary medical and living expenses" amounted to $86,400, that he is destitute, that the $86,400 covered necessi-

ties, or that he had an urgent need for medical care or living expenses. In other words, there is no evidence that the McKinneys co-signed the loan for humanitarian or charitable reasons. Moreover, "[m]ost jurisdictions have construed the prohibition on financial assistance to clients as precluding any 'humanitarian' exception permitting lawyers to help needy clients in emergency situations." MODEL RULES OF PROF'L CONDUCT R. 1.8(e) cmt. (2002).[2]

The argument that the loan is valid in both Texas and New Mexico similarly misses the mark. The issue at bar is whether the loan violates the rules of ethics. Its validity under the rules of contract law is irrelevant.

Finally, the McKinneys contend that their disqualification would be unduly prejudicial to Mr. Rubio. The only assertions to support this contention are that the McKinneys have "considerable expertise in FELA litigation" and that they have "invested a great deal of time and effort learning the particular facts and legal issues presented" in this case. (Doc. 41 at 6–7.) The McKinneys are certainly not the only lawyers in this region who are experts in FELA and the fact that they have invested time and effort on the case relates more to prejudice to them than to their client.

Furthermore, the potential prejudice to Mr. Rubio might carry more weight if he had been more forthcoming about the financial assistance he received from the McKinneys. As stated above, the McKinneys' financial assistance to Mr. Rubio first came to light during his deposition. After the deposition, Mr. McKinney advised BNSF's counsel that when Mr. Rubio referred to financial assistance from his lawyers, he was referring to the loan. It is undisputed that Mr. Rubio signed documents evidencing a loan for $86,400 and that the money was disbursed directly to him from the bank. These facts are difficult to square with his testimony that his "attorney helps [him] out now and then when [he] get[s] in a jam" and that he has no idea how much money he has to pay back.

■ After balancing society's interest in ethical conduct against Mr. Rubio's right to choose his counsel and the hardship that disqualification might impose, I conclude that disqualification will serve the purposes behind Rule 16–108(E). The loan created a conflict of interest that, particularly given the size of the loan, undermines my confidence in the vigor of counsel's representation. *See Waldman v. Waldman*, 118 A.D.2d 577, 499 N.Y.S.2d 184, 185 (N.Y.App.Div.1986) (finding no abuse of discretion in order conditionally disqualifying attorney unless client repaid loans attorney had made to her). *But see Shade v. Great Lakes Dredge & Dock Co.*, 72 F.Supp.2d 518, 520–22 (E.D.Pa.1999) (refusing to disqualify attorney who provided housing and related expenses to client whose wife was injured and who lost his job and his home and had an emotional breakdown, where there was no obligation for the client to repay the attorney).

---

2. For example, an attorney guaranteed bank loans averaging approximately $27,500 each for twenty different personal injury clients who were hurt primarily in work-related accidents. The attorney did not guarantee the loans to induce the clients to retain his services, but because the clients needed the money for living expenses and the banks would not otherwise loan the money to them. No client suffered any money damages as a result of the attorney's misconduct. Nevertheless, the attorney was publicly reprimanded and suspended for thirty days. *Nebraska ex rel. Counsel for Discipline of Neb. Supreme Court v. Shefren*, 269 Neb. 159, 690 N.W.2d 776 (2005).

*Remaining Arguments*

Having concluded that the McKinneys' violation of Rule 16–108(E) warrants their disqualification, I find it unnecessary to determine whether their conduct also violated Rule 16–108(J).

BNSF asserts that the McKinneys compounded their misconduct by omitting their financial interest from their Certificate of Disclosure of Interested Parties (Doc. 3) and by omitting information about the loan from the responses to two requests for production. After reviewing the two requests for production, I find that they did not fairly call for information about the loan. The Certificate of Disclosure of Interested Parties was not required by the federal rules or by this Court's local rules. *Cf.* FED.R.CIV.P. 7.1 (requiring nongovernmental corporate parties to disclose parent corporations and any other corporation that owns ten percent or more of the parties' stock). The McKinneys may have filed the certificate because it is required by Rule 3.1(f) of the Local Rules of the Northern District of Texas. The purpose of this type of requirement is to allow judges to determine whether they should recuse themselves. *See* FED.R.CIV.P. 7.1 advisory committee note. Because the McKinneys were listed on the certificate, albeit only as counsel, the purpose of the requirement was served.

CONCLUSION

For the reasons stated above, BNSF's motion to revoke the McKinneys' *pro hac vice* admission is granted.

IT IS SO ORDERED.